## HENRY K. MITCHELL, APPELLANT, *v.* WILLIAM T. O'NEALE, RESPONDENT.

PRESUMPTION IN FAVOR OF LEGAL TITLE OF LONG STANDING. A person claiming an interest in property, who yet has allowed another to take the title in his own name and to treat it as his own for years, must make out a strong and satisfactory case.

PARTNERSHIP AGREEMENT WITHOUT MUTUALITY VOID. An agreement of partnership between two persons, by which one, without furnishing any means or doing anything to further the common enterprise, is to share equally in the profits and property acquired, is without mutuality, founded on no consideration, and void.

ACCOUNTING BETWEEN TENANTS IN COMMON OF A MILL. Where the relation of tenants in common in a mill was established between two persons, and it appeared that one had the entire management of the concern, occasionally paying some of the proceeds to his cotenant, but that no settlement had taken place: *Held*, that though there was no partnership shown, it was a proper case for an accounting between the parties.

PRACTICE—RIGHT TO HAVE AN ACCOUNTING. Where a plaintiff alleged a partnership between himself and the defendant, and prayed for an accounting on the ground of such partnership, and the defendant answered denying such partnership, but admitting that he and plaintiff were interested as tenants in common in certain milling business, and that as to that, there having never been a settlement, he was willing and desirous that an accounting should take place; and on the trial it was found that no partnership existed, and the complaint was thereupon dismissed: *Held*, that the plaintiff, under the pleadings, was entitled to an accounting as to the milling business, and that, so far as that was concerned, it was error to dismiss the bill.

Mitchell *v.* O'Neale.

Ordering Other Necessary Parties into Court. If, in a judicial accounting between two of a larger number of tenants in common in a milling business, it be found that for a full adjustment of the account between such two the other tenants in common should be brought in, the court may order them brought in.

Appeal from the District Court of the First Judicial District, Storey County.

This was an action for a dissolution of an alleged copartnership between the parties, an accounting between them, the appointment of a receiver, and general relief. The main question of fact, as to the existence of a partnership, was submitted to a jury, which, after hearing the very voluminous testimony, returned a verdict as follows:

" We find there is no existing partnership between plaintiff and defendant other than their cotenancy in the Marysville Mill property."

After the verdict, plaintiff made a motion for new trial, which was denied, and then a motion for judgment notwithstanding the verdict, which was also denied; and afterwards, on motion of defendant, the bill was dismissed.

The material facts are stated in the opinion.

*Williams and Bixler* and *Aldrich and De Long,* for Appellant, in their opening arguments discussed at length the various instructions given and refused, particularly those upon the subject of partnership, and to some extent discussed the testimony and cited many authorities applicable to the points raised. As, however, they treated the question of partnership as settled in the Court below, it is unnecessary in explanation of the decision to give them. On the subject of parties to the bill of complaint, they argued that Mitchell, the plaintiff, was a sub-partner with O'Neale, the defendant, (Collyer on Part. Sec. 184) and that on a bill for settlement of such partnership the general partners were not required to be made parties. (Collyer on Part. Sec. 365; 1 Daniel's Ch. Pr., Perkins' Ed. 1865, 211.) They claimed that for the above reason Hall and Clark were not required to be made parties; that moreover they had been settled with, (1 Daniel's Ch. Pr., 209 ; *Towle*

v. *Pierce*, 12 Met. 329) and that the plaintiff was only seeking an account of the profits which the defendant received out of the transactions on joint account.

*C. J. Hillyer* and *Mesick and Seely*, for Respondent.

## I.

It was admitted on the oral argument that this Court, as well as the District Court, might legally consider the verdict of the jury as of no controlling force in the case and look into the testimony and make its decisions therefrom.   Hence it is immaterial what instructions were given or refused by the District Court, or what verdict was rendered, except so far as that verdict indicates the judgment of twelve men on their oaths, considering the testimony rendered by the witnesses in their hearing and sanctioned and confirmed by the Court in which it was rendered.

## II.

There is no question in the case as to who are the proper parties to the bill.   The bill makes its own case of partnership between plaintiff and defendant only, upon their contract alone, and demands a dissolution of that partnership and an account of its affairs.

The proposition that on a settlement of a sub-partnership the general partners ought not to be made parties we deny.   In the nature of the thing there can be no dissolution and settlement of the affairs of a sub-partnership, without a settlement of the affairs of the general partnership to which it relates, for until then it can never be told what belongs to the sub-partnership.   But this suit can settle the affairs of no other partnership than the one alleged. (*Tryon* v. *Sutton*, 13 Cal. 494.)

## III.

As to the Crown Point stock matter in which Hall was interested, there is no allegation in the bill that Hall and Clark have been settled with, and such allegation is necessary for dispensing with them as parties in a suit for settling that matter.

### IV.

So also if any partnership was created either in the business or running of the Marysville Mill, or in the ownership of property bought with its earning, it was not the partnership counted on in the complaint, but one existing between plaintiff, defendant, and other persons.

### V.

The complaint charges a partnership, describes its character, and sets forth the terms of the contract upon which it is based. It was necessary to do this distinctly and with legal certainty, or the bill would have been defective and insufficient to support a judgment. (Story's Eq. Plead. § 241.) It is equally clear that the proofs must sustain the contract as stated, or the plaintiff must fail. (1 Chitty's Pleadings, 304 *et seq*.)

### VI.

The partnership charged is a partnership between the plaintiff and defendant alone—a partnership commenced in 1861 by a verbal agreement determining its character and its extent, and continued for six years under and in accordance with the terms of this agreement—" a partnership in the business of milling and crushing metalliferous rock in the then Territory, now State, of Nevada, and generally all other matters and things which the said defendant might see proper to engage in, or which in his judgment promised to be profitable to the partnership."

The issue to be determined is not whether, at some time, by virtue of some agreement, the relation of partners may or may not have been created between plaintiff and defendant, or between them in connection with others, but whether *this contract alleged* was made, and whether the partnership *described in the bill* did or did not exist.

It is therefore entirely useless to inquire whether or not the owners of the Marysville Mill were or were not partners. If so, it was a partnership entirely distinct from that sued upon. It was composed of different parties—based upon an independent contract, and limited in its scope to different objects and purposes.

It is equally useless to inquire whether the arrangements entered into between Hall, Clark, and the defendant and plaintiff, in 1863, did or did not create a partnership in the purchase of the Crown Point stock. If those agreements did create a partnership between the parties, it was as distinct from that alleged in the complaint as two different corporations composed in part of the same stockholders. It did not have its inception in the contract described in complaint, and was in no way governed by its terms or conditions. It was composed of different numbers and was limited to a single transaction. The only pertinence of the evidence respecting the Marysville Mill or the Crown Point transactions is in its bearing upon the existence of the general partnership set up in the bill. Except so far as it may throw light upon this question, it cannot legitimately be considered in this action.

## VII.

In respect of what we regard as the single question in the case, viz: the existence of the particular partnership alleged and described, a few of the more prominent points of the testimony may be adverted to:

*First*—The improbable nature of the contract as alleged: that the parties were to reside in different States, and no provision made for compensation of managing partner; no provision in regard to means for carrying the business on; want of mutuality, and the strange unlimited confidence reposed in permitting one partner to engage without consultation in all matters and things which he might " see proper to engage in."

*Second*—Circumstances surrounding the contract: that it was formed in 1861, and yet not until June, 1862, did O'Neale actually determine to reside in Nevada; the key-note of the enterprise was that defendant should live in Nevada, and it hardly seems credible that an actual contract of the character claimed should have been made before such residence was finally determined upon, and even if such a conversation actually took place in 1861, it is difficult to believe that the parties considered it binding without a restatement in some definite form six months later, when defendant determined to make his residence in this State.

*Third*—Direct evidence of contract: that plaintiff 's testimony in regard to it is quite indefinite and confused, while defendant positively denies that any contract of the kind was ever made. No other person testifies either to the contract or to any subsequent acknowledgment of it by defendant, or statement of it by either party. On this evidence the Court would not be warranted in finding its existence.

*Fourth*—Subsequent conduct of the parties: that it is hardly possible to imagine the existence of a partnership such as is charged —enduring through a period of six years—the parties during half the time residing in the same city, and in daily communication with each other—embracing an extensive and diversified business—involving in many of its transactions direct relations with third persons—without there being plainer utterances than an obscure expression in friendly letters, or an ambiguous collection of figures upon a simple memorandum.

The negative testimony not only seems overwhelming, but the conduct of plaintiff has been inconsistent with it. Though most of the time pressed for money, he has given no attention to the condition of the partnership affairs; though posted on the business of the Marysville Mill, beyond that he has been utterly indifferent. Though seeing defendant every day, he has taken no pains to ascertain what transactions he was engaged in; has not known what property the alleged firm owned; never inquired whether profit or loss was made on stock transactions; never asked for any accounts; permitted mills to be bought; as a lawyer drew conveyances, without knowing whether he was interested in them or not; himself bought Bullion stock on partnership account without the knowledge of defendant; kept no account of money laid out or lost by him; borrowed money to pay a debt of honor, without so much as asking an account of the partnership, or intimating his right to the assistance of defendant; and finally executed to defendant a mortgage upon his interest in a parcel of their joint property, which he promised to repay in sixty days.

*Fifth*—As to the letters and paper called a statement. It is not pretended that there is in the letters any direct statement of a partnership, nor any language necessarily implying its existence.

There are some ambiguous expressions which might be addressed by one to his partner, or equally by one to his intimate friend. Frequent reference is made to the Marysville Mill, in which they were both in fact equally interested. Mention of " our interests in Humboldt," where both parties owned stock in the same mines. In the letters about Crown Point stock the word " our " is used. Plaintiff contends that the word refers to plaintiff and defendant. Defendant says that it refers to himself and Hall who was with him in the purchase.

As to the " statement," defendant says plaintiff wanted to borrow money from him; that he disliked to refuse it, and desired to convince plaintiff, who seemed a little dissatisfied, that although worth property he was not at that time in a condition to loan money—for this reason he gave him the paper. The exceedingly intimate friendship existing between them makes this explanation entirely probable, and the loose, indefinite character of the paper corroborates it strongly.

## VIII.

That O'Neale and Mitchell, being intimate friends,. may have talked over in Marysville the prospects of the New Eldorado; the chances of making money there; that O'Neale may have said that if he saw anything good he would give Mitchell a chance in it, is all very probable and matter of everyday occurrence. But that O'Neale had any idea that there was a contract of partnership, or that either party during the six years believed in such partnership, is contradicted by the whole tenor of their conduct.

*David Bixler*, for Appellant, in reply.

## I.

The verdict is either of some value or of none, absolutely. If of no value, it is to be considered as wholly out of the case. If on the other hand it is to be treated as of any force; we have already pointed out the errors which surround it, and cited the Court to the authorities in support of our views.

## II.

It is now claimed that there is no question of parties in the case. We agree with the proposition except in so far that if in the judg-

ment of this Court it should be determined that any other person is interested in the taking of the accounts of the partnership between the plaintiff and defendant, this Court would direct such person to be made a party for that reason. The question to be resolved under the pleadings is that of a partnership between plaintiff and defendant. If a defect of parties had appeared on the face of the bill, the defendant might have taken advantage of it by demurrer; if not so appearing and the defendant admitted the partnership, he might have pleaded in abatement. Where a bill calls for an account of partnership transactions and its whole frame is adapted and confined to that object, the defendant may plead in bar that he is no partner. (Collyer on Part. §§ 368, 370.) The defendant in this case pleaded no partnership, and that is the issue to be determined. And if in the progress of the case it had been determined that there was a partnership, and that some other person was interested in the taking of the account beside the defendant, it would have been the plain duty of the Court to have required him to be made a party.

### III.

So far as the Crown Point stock transaction is concerned, the fact that no allegation was contained in the bill that Hall and Clark had been settled with could certainly not have prevented the plaintiff from obtaining an account of it, because, although not alleged the proof showed the fact and the Court would have ordered the pleading amended so as to conform to the proof. (13 Cal. 494.)

### IV.

As to the more prominent points of the testimony.

*First*—Residence in different States and no provision for compensation of managing partner. The parties who entered into the arrangement for building and running the Marysville Mill were copartners. Yet several of them were not to reside in Nevada. Such was the agreement. As to salary, O'Neale was to receive and did receive a salary out of the Marysville Mill, and of course Mitchell paid his proportion of it out of the profits, which were diminished by the amount of that salary. The business of that mill was the chief business of the partnership in question and was constant, whilst the

other business in outside matters was but occasional.   But how many instances there are of partnerships where the partners reside in different places and no compensation is provided by the contract when formed for the services of the managing partner ?   It would be contrary to all experience to assert that because the partnership contract does not stipulate for a salary to a managing partner, the partnership never existed, or that it was improbable that it ever existed.

*Second*—No provision in regard to means for carrying the business on.   The provision was by assessments levied upon themselves, each being required to pay his share—a kind of provision which is very usual in business of that kind as all persons versed in mines and mills must be well aware.

*Third*—Want of mutuality and the strange unlimited confidence reposed in permitting one partner to engage without consultation in what matters he thought proper.

The mining ground and stocks which Mitchell acquired from his law business he turned over to O'Neale.   He may not have furnished money directly ; neither did O'Neale.   So far as the testimony goes, the chief money used, which was not furnished by the other partners, came out of the profits of the Marysville Mill.   And besides, Mitchell attended to all the law business of O'Neale without compensation.   The partnership, moreover, was a partnership at will, capable of dissolution at any moment, and not a partnership for any fixed period of time ; so that if either party had at any time felt dissatisfied with the arrangement, he was at liberty at once to bring it to a close.

*Fourth*—The contract of partnership was made in 1861.   No good reason can be assigned why the agreement should be again stated or " definitely restated," on the eve of O'Neale's departure to take up his permanent residence here.   The matter had already been determined and definitely stated.   It does not add anything to the validity of a contract to make it over again, or restate its terms.

*Fifth*—The evidence of the contract was as direct as it could be stated by plaintiff.   He does not pretend to give the identical language used in a number of conversations reaching back as far as

the fall of 1861, over six years before his testimony was delivered; but the substance of the thing is there plainly, fairly and fully stated. As there was nobody present when the parties had their conversation together and made the contract in Marysville, it can hardly be expected that a witness to it would be conjured up.

*Sixth*—The letters speak more unmistakably than the animate witnesses. The acknowledgments they contain cannot be wiped out, and no twisting of language can wrest them from the plain and simple truth. Whatever glosses may be put upon them, there they remain, the incontrovertible evidences of all the appellant claims.

*Seventh*—As to the statement, is it not extraordinary that the plaintiff should apply for it, and that the defendant should make it out with such particularity, embracing all their transactions? Not only did he appoint a special meeting to examine the accounts in his books, and write out the statement, but he prepared a copy for himself. Could all this have been merely for the purpose of " convincing" plaintiff of his inability to let him have money? It might wear a little more the color of probability if defendant had merely exhibited his accounts, and stated verbally that although he had considerable property, he was involved in debt, and therefore could not furnish any money. Men do not act in that way in the ordinary business of life.

## V.

It will not do to apply the same staid and strict rules in judging of the business relations and transactions of men in new countries like California and Nevada which are usually applied in respect to business relations and transactions in old and more sedate communities. The looseness with which business is transacted here amongst our people would astonish the man brought up in another school and accustomed to move in the regular grooves of the old-fashioned way of doing things. Let the same man live for a little while amongst us, and he too forgets his old habits and imbibes the spirit which surrounds him. And it is with a due regard to these circumstances that this case is to be raised.

By the Court, LEWIS, C. J.

The examination of this case has conducted us to these conclusions:   1st. That the evidence is not sufficient to establish a copartnership between the plaintiff and defendant of the general character alleged in the bill; but, 2d, whether a partnership of any kind were proven or not, the plaintiff made out a case entitling him to an accounting with respect to the operations of the Marysville Mill, and therefore that his bill should not have been dismissed.

As it is desirable to dispose of this case upon its merits, we will proceed to give the reasons which have conducted us to these conclusions.   Whether a general partnership between the parties existed or not is a proposition not by any means relieved from doubt, for the plaintiff testifies positively, as alleged in the bill, that a partnership was entered into which was to extend to the business of milling and crushing metalliferous rock, and generally to all matters and things, which the said defendant might see proper to engage in; but the testimony of the defendant is direct, positive and unqualified that no partnership agreement of any kind was ever entered into between himself and the plaintiff.   Such conflict in the testimony of two persons of unquestioned veracity must necessarily involve the first conclusion arrived at in considerable doubt.   The burden of proof, however, is on the plaintiff, and in a case of this kind where it is sought to obtain the legal title to, and possession of, a large amount of property, both real and personal, all the outward evidence of right and title to which is in the defendant, the proof should be very satisfactory indeed to justify a decree such as that sought by this bill.   He who claiming an interest in property yet allows another to take the title in his own name and to treat it as his own for years, cannot complain if when he seeks to establish his right to such property he is required to make out a strong and satisfactory case.   The Courts have ever been averse to disturbing the title of the ostensible owner of real property, except upon clear and weighty proof.   The inclination is always to favor the legal title and maintain it in him who holds it.   But the testimony on behalf of the plaintiff in support of the partnership falls far short of being satisfactory or convincing.   Indeed, upon a candid weighing

of all the testimony and placing upon it the most favorable construction possible for the plaintiff, still, whether such general partnership as that attempted to be proven was in fact entered into remains exceedingly doubtful. The very inequality of the original agreement of partnership, accepting it as explained by Mitchell, at once creates the impression that he must have been mistaken as to its character. It appears that all the work and labor were to be performed by O'Neale, whilst the only obligation which the agreement seems to have imposed upon the plaintiff was that of sharing the profits and accepting an equal interest in the property acquired by the efforts of the defendant. The latter was to emigrate to Nevada, where he was to enter into any and all kinds of speculations and business which he might deem proper, and without being obliged to furnish any means or doing anything to further the common enterprise the plaintiff was to have an interest in every transaction entered into and all property obtained by the defendant. This copartnership agreement, in short, appears to have been nothing more than a promise on the part of O'Neale to give to the plaintiff an equal interest in all the property which he might secure in the State of Nevada. Upon the showing thus made by the plaintiff himself the contract or agreement was entirely without mutuality, founded upon no consideration and hence entirely void. Let it be supposed that such a promise was made and the defendant with the intention of fulfilling it came to Nevada and acquired property, taking the title in his own name, can it be said that upon such a promise the plaintiff could secure a half interest in all such property ? We think not ; and yet there is little if anything else than such a promise upon which the plaintiff can claim an interest in the property held by the defendant, except the Marysville Mill and the Crown Point stock. He advanced money for the purchase of the mill, and it is acknowledged that he was admitted to, or interested in, the stock. But it is not claimed that he furnished any money whatever for the purchase or acquisition of the balance of the property in which he claims to be interested, and hence his interest in it must rest solely upon the agreement testified to as having been entered into in the State of California.

It seems to us the plaintiff's own testimony fails to make out his

case, establishing as it does only a naked promise by O'Neale founded upon no consideration. As, however, this point is not made by counsel, we will not rest our decision upon it, but proceed with the consideration of the question as to whether any contract or agreement of copartnership whatever is established by evidence sufficient to justify a recovery by the plaintiff.

Mitchell's testimony, as has already been stated, is positive and explicit that a contract of partnership, as above described, was entered into, and the defendant as positively denies it—and so there is a direct conflict between the parties as to the existence of any contract of partnership whatever. So far as the plaintiff's interest in the Marysville Mill is concerned, there is no conflict in the evidence—O'Neale himself testifying that he purchased a quarter interest in the mill, and afterwards sold one-half of such interest to Mitchell for a consideration, a part of which was paid before the mill was completed. And this acknowledged interest in the mill will serve to explain many of the expressions employed by the defendant in the letters to which reference will hereafter be made. The very nature of the contract, as stated by Mitchell himself, would doubtless make the evidence thus far preponderate in favor of the defendant; for it is very improbable that any person would enter into a contract so burdensome to himself, and yet yielding him no advantage. There is, however, some other evidence, which it is claimed tends to establish the copartnership, and thus to corroborate the plaintiff's testimony. But in our opinion counsel attach more weight to that evidence than it is entitled to. McGowan's testimony does not go beyond showing a joint interest or partnership in the Marysville Mill. So, too, with Barbour's. He states explicitly that in the conversation between himself and O'Neale the admission of partnership was confined to the mill. And in the papers and pleadings in the case of Reilly v. O'Neale and others, not a syllable appears indicating any community of interest beyond that. Hall's testimony is confined exclusively to the transaction of the purchase of the Crown Point stock, and there is nothing tending to show any partnership connection between the parties in any matter beyond that particular transaction.

In the letters written by the defendant to Mitchell there are some

fugitive expressions which may be construed as a recognition of a general partnership, but they admit of so many natural and rational explanations and are so vague in themselves that they cannot be accepted as proof entitled to much, if any, weight.    In the letter of March 28th, A. D. 1863, this portion is referred to in support of the plaintiff's case : " I made a purchase yesterday of sixty feet of Crown Point stock, in which Joe Clark is equally interested. The cost is five thousand dollars, being about eighty-three dollars per foot.    It cannot be had for anything like those figures to-day. I think it an admirable investment, and candidly believe that in less than sixty days we will be able to realize from our half of it fifteen thousand dollars.    The purchase is not connected with the mill, which I consider at the present time an advantage.    The ground adjoining it on the south (which by the way is known to be good)' cannot be had for less than three hundred dollars per foot. The same ground sold one week ago for eighty dollars.    I am now negotiating for sixty feet more, and am willing to pay one hundred dollars per foot.    Will know to-morrow whether or not I can get it. None of the incorporated Crown Point is for sale at any price. The Yellow Jacket claim, bounding it on the south, is selling now for three hundred and seventy-five dollars per foot, and not much in the market at that price.    The purchase is not a company matter."

That O'Neale would not write to the plaintiff so minutely with respect to business matters in which the latter had no personal interest, is entirely without weight, when it is remembered that these parties were, at the time this letter was written, connected by the most intimate and friendly relations.    The employment of the pronoun " we " and the pronominal adjective " our " is referred to as a recognition by the defendant that Mitchell was interested with him in the stock, counsel arguing that these words, being in the plural form, could not possibly refer to any but the writer of the letter and the plaintiff to whom it was written.    If such were admitted to be the case, still it would not, even unexplained, be a very strong circumstance in favor of a general partnership between the parties, for it does not follow that such relation existed between them simply because they were jointly interested in one transaction

of this kind. But the inference deduced by counsel from the letter is not by any means necessary or exclusive. In the first place, the assumption that the defendant would not have used the words " we " and " our " in the connection in which they are employed unless some one was interested with him in the stock spoken of, has but the barest probability to rest upon. Although incorrect, it is not unfrequently the case that the plural pronoun is used for the first person singular, and so with the pronominal adjective " our." It may be admitted that it is improbable that they were so used by the defendant. What then? We have simply a bare probability that *some one* was interested with the defendant in the Crown Point stock written about. But then comes the inquiry, Who was that person? What evidence is there that it was the plaintiff? As a matter of fact, the person actually interested with the defendant, whoever he might be, was the person referred to. Who that person was does not appear from the letter. Let it be supposed that in this letter the defendant had mentioned Hall as being interested with him in the stock, it would not here be contended that the expressions referred to by counsel could indicate that the plaintiff had any interest. Hall and the defendant could alone be considered as the persons represented by the personal pronoun employed. We do not see how the failure to state who the interested person was can indicate that the plaintiff was that person, any more than if it had been stated that Hall was interested. Without such statement or explanation, it is true, the letter would not convey to the plaintiff the information who the person interested with the defendant was, nor the extent of O'Neale's personal interest. It may, however, have been deemed unnecessary to give that information.

It is argued that as no person was mentioned in the letter by the defendant as being interested with him, and that as the letter was addressed to the plaintiff, it is a natural inference that he was the person interested. If the plaintiff did not in fact know who was interested with O'Neale, it is possible that such an inference might be deduced from the language. Suppose, however, Mitchell, by a previous letter or in some other way, had been informed that Hall had made the purchase of the stock with the defendant, the

expression in the letter would not certainly have authorized any such inference. Why? Because the plural pronoun used could and would not then have conveyed to him the impression that any one but Hall was interested with the writer of the letter. The language, of itself, therefore, contains no positive admission that the plaintiff was interested with the defendant. If it be an admission of anything at all, it is a simple admission that some one not mentioned was interested with him. Who that person was does not appear from the letter, but when the facts are brought to light, it appears to have been Hall. It is shown that the defendant, Hall, and Clark purchased sixty feet of stock; Clark to have thirty feet, one-half, and the defendant and Hall to be equally interested in the other half. This fact being known, it is seen the plural pronouns were very properly employed as referring to Hall and the writer of the letter; and the only thing necessary to render the whole letter perfectly intelligible was the mention of the name of the persons referred to by the words " we " and " our." With the impressions which Mitchell may have had about this matter we have nothing to do. The inquiry here is whether O'Neale, in the letter referred to, admitted that the plaintiff had an interest in the stock. As the employment of the expressions referred to is explained by the fact that Hall was interested with him, to say that he did not refer to Hall, but to the plaintiff, simply because the letter was addressed to the latter, and no explanation is made as to who the third party was, is the assumption of a fact upon the weakest probability imaginable. An occasional use of a plural pronoun by the defendant when writing with respect to the mill, the stock above referred to, and the mining interests in Humboldt County, is all that is found in the many letters produced by the plaintiff and introduced in evidence in support of his testimony that an unlimited partnership existed between himself and O'Neale. We doubt whether any persons occupying the social relations existing between these parties could very well exchange the number of letters upon business matters here introduced and employ fewer expressions tending to establish some joint interest between them, than can be found in those presented in this record.

A paper is then produced purporting to be a statement of

the liabilities and assets of the partnership, furnished by the defendant to the plaintiff, the history of which is thus, in substance, related by the plaintiff: Being somewhat dissatisfied with O'Neale, because of some business transaction, he demanded a statement of the condition of their affairs. In compliance with this request a paper was made out which contains a statement of debts amounting to about thirty-two thousand dollars, and also of property, or assets, the value of which, however, is not mentioned. This, plaintiff testifies, was given him as a statement of the assets and liabilities of the partnership. But the defendant testifies with respect to it in this manner :

In the month of January, A.D. 1866, " Mr. Mitchell came to me and wanted to borrow money. He had done so repeatedly before, and I had stated to him my condition and inability to let him have it. I thought from his manner he doubted the correctness of my statement. This was on Friday or Saturday. I told him to come to the Marysville Mill on the next Sunday and that I would give him an exhibit of my affairs, and convince him of the correctness of what I had told him, and I gave him the statement for that purpose."

As a statement of the condition of a partnership it is admitted this paper is deficient and imperfect in many particulars. The name of the plaintiff nowhere appears upon it, nor is there anything in it indicating that he was in any wise interested in the property described. It is, however, argued that such a statement could only have been intended as an exhibit of partnership affairs ; that it is not probable the defendant would have made out such an exhibit simply for the purpose of showing that he was not able to loan the plaintiff money. But why not probable ? These parties were very intimate and had been so for years. That the defendant should desire to satisfy his friend that he was really unable, rather than unwilling, to accommodate him, surely bears nothing improbable about it. That is of daily occurrence, and is prompted by the most natural feeling of our nature. Why, it is asked, should an exhibit of the assets or property be made, if the only purpose were as stated by the defendant ? Surely that was necessary even for that purpose. An exhibit of the defendant's indebtedness only, without

his assets, would surely not satisfy the plaintiff that the defendant was not able to loan him money.    It will not be denied, we presume, that it was necessary even for the purpose stated by the defendant to make an exhibit of his liabilities.    Why not equally necessary to make a showing of his assets which were to meet such liabilities ?    His assets might have greatly exceeded his liabilities, and been of a character which might be readily convertible into money.    Hence it was certainly necessary for the defendant, if he wished fully to satisfy the plaintiff that he was not in a condition to loan money, to make an exhibit not only of his liabilities, but also of his assets.    O'Neale's explanation of this statement is not then so improbable as it appears to be to ·counsel for appellant.    We see nothing in it either unreasonable or improbable.

And this is substantially all of the plaintiff's testimony to establish the contract of copartnership claimed to have been entered into between himself and the defendant.    The plaintiff, it must be admitted, testifies with certainty and clearness, but is corroborated only by the expressions used in the letters, and the exhibit above referred to.    On the other hand the defendant as distinctly and positively denies that any contract of partnership was ever entered into between himself and the plaintiff, and his testimoney is· corroborated by circumstances, not perhaps of any great weight, yet not entirely unworthy of consideration.    Although the defendant was constantly engaged in speculations and business transactions of various kinds, and this too with the knowledge of Mitchell, yet no inquiry seems to have been made as to the condition of matters during all that time.    So, too, when the plaintiff desired to obtain money from the defendant, without any mention of other property, or inquiry as to the condition of affairs, he mortgaged his interest in the Marysville Mill to obtain it of him.    Although it is conceded there was no motive for concealing the partnership, yet during the entire period of about six years the plaintiff has failed to show that the defendant either directly admitted, or did any act beyond what we have referred to, recognizing any such partnership.    And while Mitchell made frequent inquiries with respect to the Marysville Mill, he seems never to have given the other business or transactions in which he

34

now claims to have been interested a single thought.    Such circumstances, although not leading directly to the door of truth, are inconsistent with the existence of the general partnership claimed to be existing between these parties.    It is not natural that man should be so utterly indifferent about matters of this kind, and by his frequent inquiries about the Marysville Mill property it is at least rather evident that such indifference is not a characteristic of the plaintiff.    The direct testimony of the defendant, corroborated in some degree by these and many other circumstances of like character, which are found in the record, to say the least, renders the existence of the general partnership, testified to by the plaintiff, a matter of doubt.    So much so certainly that it cannot very well be held that the plaintiff, upon whom the burden of proof rests, has established it by such a preponderance of evidence as to authorize the reversal of the judgment and finding which were against him in the lower Court.

But notwithstanding the testimony does not establish the contract of partnership which forms the foundation of the plaintiff's cause of action, yet the evidence very satisfactorily, to our mind, makes out a case entitling him to an accounting, not by reason of any partnership, for that could only be created as between the parties themselves by an agreement or understanding to that effect, (and that we conclude is not sufficiently shown here) but by reason of their relations as tenants in common, and the necessity of an accounting before relief can be granted.

It appears that for a period of six or seven years the parties have been interested together in the Marysville Mill and its earnings, O'Neale having the entire management of the concern, receiving all the profits, and occasionally paying money to the plaintiff.    But no settlement seems ever to have taken place between them.    Under such circumstances an accounting will always be decreed, although no partnership be proven, for the establishment of that relation is not always essential to the right to have an accounting.    (*Post* v. *Kimberly*, 9 J. R. 470.)

Willard in his work on Equity, 92, observes: " On the whole, it may be laid down as the general rule, deducible from what has been said, that equity entertains a general jurisdiction in matters

of account growing out of privity of contract.    Where there are mutual accounts; where the accounts are all on one side, and a discovery or a writ of *ne exeat* is prayed and granted; where the taking of an account of several estates is necessary; where multiplicity of suits renders the trial difficult, expensive, and unsatisfactory at law." (See also Ib. 91; *Garr* v. *Redman*, 6 Cal. 574.) It is evident, then, that the existence of a partnership was not essential to the plaintiff's right to an accounting.    But it may be objected that as his bill charges a partnership, and the account is prayed of partnership transactions, he is not entitled to a decree for an account of matters growing out of other relations. Perhaps, as a general rule, upon a bill for the adjustment of copartnership affairs, an account would not be decreed with respect to matters not connected with such partnership.    Here, however, the answer obviates all such questions, for it is distinctly admitted that the plaintiff had, or has, an interest in the Marysville Mill, and shows a state of affairs certainly entitling the plaintiff to an account to that extent, and goes on to state that the accounts between plaintiff and defendant, relating to the transactions of the Marysville Mill, have never been settled, and defendant is at present unable to state precisely how the same do stand; but he is ready and willing to have a fair, full, and just settlement of the same, and of all other matters between him and the plaintiff, and to pay him any and all sums found due him upon such settlement. Upon this answer the plaintiff was surely entitled to an accounting with respect to the affairs of this mill.    To that relief he was entitled upon the pleadings themselves. · The Court below therefore erred in dismissing the bill.

As a decree is sought only against the defendant, it is not essential to the plaintiff's case that any of the other tenants in common in the mill, or the persons interested with himself and the plaintiff in the stock enterprise, should be parties to this bill; if, however, the Court should find that full adjustment cannot be had without bringing them into Court, it may order them brought in.

We are further of the opinion that the plaintiff, upon an amendment of his bill, showing the facts respecting the second Crown Point stock transaction, will be entitled to an account of that also.

The judgment dismissing the bill is reversed, with leave granted the plaintiff to amend, should he choose to do so; and the Court below will decree an accounting of all matters touching the Marysville Mill; and, should the bill be amended, also of the second Crown Point stock transaction.

It is so ordered.

WHITMAN, J., did not participate in the foregoing decision.