# SCHMIDT *v.* HORTON Et Al.

No. 2865

April 5, 1930.                                    287 P. 274.

*Wm. McKnight* and *Joseph T. Murphy,* for Appellants:

308

*Brown & Rowson,* for Respondent:

## OPINION

By the Court, DUCKER, C. J.:

This is a suit in equity. The respondent prayed for a decree to have conveyed to him an undivided one-third interest to all of the mining claims mentioned in his complaint still remaining unsold, and in lieu thereof, where any had been sold, a one-third interest in the proceeds therefrom; that a receiver be appointed; and for an accounting.

It is alleged in the complaint: "That on or about the 5th day of January, 1927, in consideration of the mutual advantages to be derived therefrom, plaintiff and defendant, Frank E. Horton, Jr., promised and agreed to and with each other to combine their efforts and means in prospecting for, discovering and locating mines and mining claims, and that they should be equal partners in all of such locations and own in equal shares any and all such mining claims and mines so discovered, or in any manner acquired by either of them; that thereafter, on or about the 5th day of February, 1927, the defendant, Leonard Traynor was admitted by plaintiff and said defendant, Frank E. Horton, Jr., as a member of their said partnership, and plaintiff and said defendants Frank E. Horton, Jr., and Leonard Traynor thereupon agreed that thenceforward any and all mining claims and mines so discovered, located, or in any manner acquired by the parties should be held and owned by plaintiff and said defendants in common, each having, holding and owning an undivided one-third (⅓) part share and interest therein, and that all of the costs and expenses of said partnership should be borne equally between plaintiff and said defendants."

It is further alleged in the complaint that: "Plaintiff performed all of the conditions of the partnership agreement on his part to be performed, and between the 5th day of January, 1927, and the 2d of March, 1927, expended in behalf of said partnership and furnished said partnership with provisions and supplies for the purpose of prospecting and carrying on the business of said partnership, of the value of One Hundred and Fifty ($150) Dollars or more." It is further alleged that: "Defendants undertook to and did defraud plaintiff of his interest in said partnership, and that in violation of their agreement with plaintiff, and for the purpose of cheating and defrauding plaintiff, said defendants, on or about the 4th day of March, 1927, located under the laws of the United States and of the State of Nevada, certain mining claims in the Weepah Mining District, County of Esmeralda, State of Nevada, known as Dodger, Dodger No. 1, Dodger No. 2, Dodger No. 3, Dodger No. 4, Dodger No. 5, Dodger No. 6 and Dodger No. 7, and Reno, as well as a number of other mining claims in said mining district, the names of which are unknown to plaintiff, and ever since have fraudulently and dishonestly excluded plaintiff therefrom and from participation in the proceeds derived from the sale or sales thereof; that plaintiff is informed and believes, and so alleges, that thereafter defendants sold or agreed to sell under an option agreement the aforementioned group of mining claims described as the Dodger Group to the Belcher Extension Mining Company, a corporation, which said sale was without the consent of plaintiff, for the sum of Thirty Thousand ($30,000) Dollars, or more, whereof the sum of Twenty Thousand ($20,000) Dollars has been paid to the said defendants, and the sum of Ten Thousand ($10,000) Dollars is due and payable under the terms of said option on May 10, 1927; and that defendants have sold, or agreed to sell, others of said mining claims so located and acquired by defendants as aforesaid, the names of which are to plaintiff unknown, to Weepah Horton Junior Gold

Mines Company; to one Zeb Kendall, and to divers sundry other persons and corporations whose names are unknown to plaintiff; that defendants deny and repudiate said partnership and that they refuse to make any statement or accounting of said partnership business, although they have been heretofore requested by plaintiffs so to do, and although said partnership relationship continued and was still existing on said 4th day of March, 1927, and on to wit, the day or days on which said mining claims were located by said defendants as aforesaid."

A demurrer to the complaint on several grounds was overruled, and appellants answered. All allegations concerning the agreement alleged in the complaint were denied in the answer. The minority of the appellants Frank E. Horton, Jr., and Leonard Traynor at all times mentioned in the complaint was set up in the answer as a further defense. The case was tried before the court sitting without a jury, and judgment was rendered in favor of plaintiff, respondent here. A motion for a new trial was denied. The appeal is from both the judgment and order.

■■ The complaint was assailed as being insufficient on several grounds. The principal contention in this respect is that the allegations of the complaint show merely an unexecuted partnership agreement. It is insisted that such an agreement is not enforceable in a suit in equity, and that respondent's only remedy is an action at law for breach of the alleged contract to form the partnership. While the complaint designates the agreement as a partnership agreement, we do not think that its allegations disclose such an agreement. The nature of the agreement must be determined from the facts pleaded, despite any designation which may be given to it by the pleader. Shea v. Nilima (C. C. A.), 133 F. 209. The object of the venture in the agreement pleaded goes no further than to search for, discover, and locate or otherwise acquire mining claims. Something more is required to establish a mining partnership. Costello v. Scott, 30 Nev. 43, 93 P. 1, 94 P. 222; Lindley

on Mines (2d ed.), vol. 2, sec. 858, p. 1565, et seq.
■ We think the complaint states a cause of action based on the doctrine of joint adventure, as this modern doctrine has been recognized by this and other American courts. We may say of the complaint in this case, as was said of the complaint in Miller v. Walser, 42 Nev. 497, 181 P. 437, 441, that it "states the agreement of the parties; the consideration upon which it was based;. the thing that was to be done in pursuance thereof, namely the acquisition of the claims and the interest of each in the subject matter of the contract. No further averment is required to invest the arrangement alleged with all the elements of a joint adventure."

Other objections were made to the complaint which we have examined and find to be without merit. The demurrer was properly overruled. Appellants claim the evidence is insufficient to support the judgment. After a careful consideration of the evidence and law applicable to the case, we are induced to hold to the contrary.

The mining claims involved, and which respondent seeks to impress with a resulting trust in his favor for a one-third interest, are known and designated as Dodger, Dodger No. 1, Dodger No. 2, Dodger No. 3, Dodger No. 4, Dodger No. 5, Dodger No. 6, Dodger No. 7, and Reno, a contiguous group situate in Weepah mining district, Esmeralda County, Nevada. The claims were located by the appellants Frank E. Horton, Jr., and Leonard Traynor on March 3, 1927, and the discovery of ore which led to the location was made by them on March 1, 1927. The respondent and the two locators were all minors at the time of the discovery and when the action was instituted in the court below. The version of the facts and circumstances given by the respondent and his witnesses is substantially as follows:

On January 1, 1927, respondent and appellants Frank E. Horton, Jr., and Leonard Traynor were all residents of Tonopah, Nevada. Schmidt was at that time, and for some time past had been, in the employ of the Western Union Telegraph Company at that place as lineman at a salary of $150 per month and

expenses when out on the line. He was unmarried, was living with his parents and contributing about $75 per month to the family support. During the month of January of that year, Schmidt heard of a mining property belonging to a man at Tonopah Junction named Vandersault. Schmidt discussed the Vandersault property with Traynor, and they agreed to take a lease on it. They went together to the Vandersault property using the telegraph company's motor for the journey, and secured some samples. They signed the following agreement concerning the property:

"Tonopah, Nev., Jan. 13, 1927. We, the undersigned, do hereby agree to enter into a partnership whereby each is to bear an equal portion of the expenses incurred in the development of the property owned jointly by Harvey B. Vandersault and Hayden Howard. They do also agree to divide equally any profits that may be derived from the above mentioned property. [Signed] W. E. Schmidt, F. E. Horton, Jr. Witness, Leon Williamson."

It was several days before returns were received from the samples, and in the meantime Schmidt and Horton concluded that they would need an automobile if they took a lease on the mining property. They negotiated with one "Dutch" Helmick for a Ford car, which they finally purchased for $20. Schmidt paid the money for the car. This they afterwards called "Dutch Bug." There were no tires or battery on the car. Helmick gave them two tires and a battery. They told Helmick they had a partnership and needed a car to go out in the hills prospecting. Helmick asked them to let him know if they found anything that was good so he could have a chance to go out and locate. Schmidt and Horton worked on the car and got it in running order. According to Schmidt, it required about four hours of labor on the car to put it in condition. He estimated the worth of the labor at 75 cents an hour. He also bought and paid for some material which he used in getting the car in condition to be operated. Horton put 55 cents worth of gas into it at one time. After the car

was conditioned it was damaged by another car running over it. This necessitated further repairs and more material. According to Schmidt, the further repairs required about twenty hours of labor and material costing $2, which he paid.

Schmidt and Horton were dissatisfied with the result of the assays from the Vandersault property and abandoned their enterprise as to that property. Horton told Schmidt that he knew of a property that would "beat the Vandersault property all hollow." He referred to a property near Weepah from which they afterwards took samples and named "Eiaura." About the middle of January they made a trip from Tonopah to see this property. They went in the car they got from Helmick. Schmidt bought and paid for some lunches and gas and oil for the trip and borrowed a tube for the car. Horton furnished some blankets. They stayed overnight at Weepah and took samples from the "Eiaura." They did not locate this ground at this time, but planned to do so later. They returned to Tonopah and had the samples assayed. The result of these assays pleased them and they talked about it a little. They talked about it to the appellant Leonard Traynor, who became interested and asked to join their partnership. They discussed this proposition and Traynor offered to buy in for $100. The proposition was held in abeyance for a while. Shortly afterwards, on February 4, the respondent Schmidt and the appellants Horton, Jr., and Traynor made a trip from Tonopah to Death Valley to locate claims. Traynor furnished his father's Dodge car for the trip. Traynor and Horton furnished grub and blankets for the trip and Schmidt furnished gas and oil. Horton, Traynor, and Schmidt located one claim in Death Valley. They did not corner the claim. The claim was located in the names of Traynor's father, Horton's mother, and Schmidt's mother for the reason that Schmidt was under the impression that persons under the age of twenty-one could not locate mining claims. They took samples but lost them on the way back to Tonopah. When they returned to

Tonopah, they decided to do nothing more concerning the claim located in Death Valley.

On February 5' in Tonopah, Horton and Schmidt agreed to allow Traynor into their partnership in the Eiaura property near Weepah for $100. Traynor did not have $100 and offered, if they would let him come into the partnership as to the Eiaura property, to tell them where there was another property in Danville Canyon formerly owned by his father, which had been allowed to lapse, which they could all three locate in partnership. This was agreed to by Horton and Schmidt. Horton, Traynor, and Schmidt agreed to be partners in prospecting, each to pay one-third of the expenses and share one-third of the profits in locating, acquiring, and selling claims. Traynor, Schmidt, and Horton left Tonopah for Danville Canyon on February 6. They went in the "Dutch Bug." Danville Canyon is about one hundred miles from Tonopah. Horton and Traynor furnished blankets, cooking utensils, gun, and ammunition, while Schmidt furnished the grub, gas, oil, and a tube. Schmidt bought grub enough for a three-day trip and paid $14.65 for it. He paid $2.25 for a tube. He did not remember how much he paid for the gas and oil, but filled the tank up, supplied what oil was needed, and took oil along. They located four claims in Danville Canyon. Located them in the name of Horton's mother and Schmidt's mother, as Traynor did not want his father to know he was jumping his ground. These claims were located in the parents' names for the same reason that the claims in Death Valley were located in that way. Boundaries of the claims were not marked, but monuments were erected and location notices posted. They intended to return at a later date and mark boundaries and do location work if samples proved satisfactory. They took about twenty samples from the claims. They returned to Tonopah on the 9th of February, and by the time they got back the "Dutch Bug" was so badly worn and damaged that it was completely out of commission. It was hopelessly wrecked and they used it no

more. The samples from the locations in Danville Canyon were assayed and turned out fairly well and they decided to go back and corner their claims. As the "Dutch Bug" was extinct, they had to plan some other means of transportation. Traynor had a Ford. It needed conditioning to put it in running order. They started to work on it about February 15th, and got it into condition about the 26th of February. They put in about twenty hours of work on it during that time. Most of the work was done by Schmidt. Traynor did some; Horton little, if any. Schmidt's contribution to the reconditioning of the Traynor Ford included twenty hours of labor at 75 cents an hour, or $15, and also material and supplies worth $28 or $29, and also gas and oil valued at $3.25. Schmidt's contribution of materials and supplies included two tires, one battery, 21 feet of electric wiring, clamp for wishbone, a band for transmission, and some gaskets. The total value of the labor, material, and supplies contributed by Schmidt to the reconditioning of the Traynor Ford was $48.25. He testified that the aggregate value he expended for the partnership between the three, in provisions, money given Traynor and Horton, labor, and supplies, was $155.80. Some of the materials used in reconditioning the Traynor Ford, as the battery and two tires, had been taken off the "Dutch Bug" and these had been paid for by Schmidt. The reconditioning of the car was for the purpose of returning to Danville Canyon to corner the claims located by Horton, Schmidt, and Traynor. On the 17th of February when Schmidt and Traynor were working on the car and Horton was standing by, the former said to Horton that he was not barred from working either. Horton took offense at this remark and walked away.

Later on that same day Horton told Schmidt that so far as he was concerned the partnership was off. Still later in the evening Schmidt saw Horton and endeavored to ascertain why he wished to withdraw from the partnership, but could get no reason from

him.  Schmidt asked him about the expenses he had been to and got no reply.  Schmidt did not at this time or at any other time relinquish or quit Horton of his obligation for the expenses.  Neither at this time, nor at any later time, did Traynor ever withdraw or declare his withdrawal from the partnership.  He and Schmidt agreed to carry it on.  On February 20, three days after Horton had declared himself out of the partnership, Traynor and Schmidt made a prospecting trip to Weepah in company with one Robert Crumley, in the latter's automobile, and located three mining claims in the Weepah district in the names of Crumley, Traynor's father, and Schmidt's mother.  At the time this prospecting trip was made, Traynor and Schmidt thought that Horton had withdrawn from the partnership.  On the 28th day of February, Schmidt learned that Horton and Traynor had planned to go out the next morning after high grade which Horton had previously claimed to have knowledge of.  This was the first time that Schmidt learned that there had been any change in the plans to use the Traynor Ford to return to Danville Canyon.  Schmidt saw Traynor and Horton on the morning of March 1 as they were getting ready for the start to Weepah in the Traynor Ford, and according to Schmidt the following occurred:  "Horton got in the car and Traynor was on the outside of the car.  I asked Traynor, 'Do I come in on this?' and Traynor said, 'Yes.'  I said, 'Do you realize you have my tires and tubes, using them on the car?' and he said, 'Yes.'  And they drove off down the little hill and that's the last I saw of them that morning."

Horton and Traynor had some discussion during several miles of this trip, in which Traynor maintained that Schmidt was entitled to recognition in the venture.  During the afternoon of this day Horton and Traynor made a discovery of some very rich ore in the neighborhood of Weepah.  They returned to Tonopah the next day, and on March 3 left Tonopah before daylight, returned to Weepah, and located the ground on which

the strike was made. Schmidt was not included as a locator. They located the groups of claims which are the subject of this controversy.

The news of the strike leaked out in Tonopah after the boys returned with the ore they found, and soon a typical mining boom was precipitated in that region. Schmidt heard of the strike shortly after Horton and Traynor returned with the ore, and took them to a show that evening. He tried to find out where the strike was made, but they would not tell him. He asked them if he was in on it and Horton would not say anything. Traynor told him not to worry, that there would be no "double crossing." Schmidt made repeated efforts to find out from Horton and Traynor how he stood in the matter without success, further than what Traynor told him, that there would be no double crossing.

On March 3, some men of Tonopah who had heard of the strike and were anxious to find out where it was so they could go out and locate ground got Schmidt out of bed at 4 o'clock in the morning and asked him to find out for them where the strike was made. Schmidt went to Traynor's house and awakened him, but Traynor would not tell him where the ore was discovered. Schmidt at this time again asked Traynor where he stood, and in reply Traynor said: "He couldn't say, not to worry, there wouldn't be any double crossing." Schmidt testified: "I let it go at that and he told me to go back to bed and I did."

To make the trip to Weepah, Horton and Traynor got nine gallons of gas from Leland Henderson, a garage man of Tonopah. They promised to "cut him in" on anything they struck, and he afterwards realized $5,000 on it. Later in the day of March 2, Schmidt met Traynor and Horton and again asked them whether he was in on the find or not. Traynor again assured him that there would be no double crossing, but Horton said nothing. On the afternoon of March 3, Schmidt went to Weepah and stayed overnight. He saw Horton and Traynor there then. On March 5 he returned to

Weepah in company with one Durfee and located two mining claims. He went back to Weepah again on March 6 with one Emery Marty and located more mining claims.

Schmidt testified that he never relinquished any contractual or partnership interest that he may have had with Traynor and Horton or from any obligation they owed him; that Traynor and Horton had no employment and were always broke. He testified that on the occasion when he saw Horton and Traynor on the eve of their departure for Weepah they both said he was in on it; that if they had said no, he never would have consented to the use of his material and equipment on the car; that he did not make them a present of this material and equipment; that he did not loan it to them; that the change in the plans of going to Weepah instead of returning to Danville Canyon was agreeable, providing he was in on the new venture.

■ This testimony was controverted in several respects by the testimony given by Traynor and Horton, particularly as to any partnership agreement between them. It was controverted also as to the amount of Schmidt's contribution in labor and material in the reconditioning of the Traynor Ford and the purpose for which the car was reconditioned. Traynor testified that it was done with the understanding that Schmidt was to have the privilege of using it in his employment at the Western Union whenever he (Traynor) was not using it, and not for the purpose of returning to Danville Canyon to corner or do other work on claims located pursuant to any partnership. The testimony of respondent was also sharply controverted as to what was said when Traynor and Horton were getting ready to leave for Weepah on the morning of March 1. They testified that neither of them said anything about Schmidt being in with them on any locations that might be made on that trip; that he made no protest as to their using the car; that he wanted to go, but they refused him; that he offered to put up some lunches,

322

which they refused. The testimony of the parties is in conflict in some other respects. However, whenever the testimony presented by respondent and his witnesses is controverted by the testimony of appellants and those testifying in their behalf, the finding of the lower court in favor of respondent must be accepted as conclusive of the facts found. The conflict in the testimony of the parties and the contradictions in respondent's testimony, repeatedly referred to in the briefs of appellants' counsel and in the oral argument in this court, are beyond our jurisdiction to consider. This is upon the well-settled rule that a finding of the lower court will not be disturbed on appeal when there is substantial evidence to support it. This rule is as binding in an equity case as in an action at law. Costello v. Scott, supra.

■ It is apparent from the evidence that the business relation established between Schmidt and Horton was in its inception limited in its purpose to the Vandersault property. But the trial court was justified in finding from the testimony of Schmidt that it was thereafter extended to the Eiaura group of claims near Weepah, the claims in Death Valley, in Danville Canyon, and the property discovered by Traynor and Horton, Jr., on March 1 near Weepah, and that Schmidt contributed something in the way of labor and property to each of these ventures. Moreover, if it were conceded that the testimony is not sufficient to show a continuing venture of this scope, it is, nevertheless, sufficient to justify the trial court in finding, as it did find, that on March 1, 1927, it was agreed between Horton, Traynor, and Schmidt, prior to the departure of the two former for Weepah, that Schmidt was in on the trip as a partner, and that he contributed towards the expedition in labor and materials on the automobile used, of the aggregate value of $48.85.

■ From these facts the court reached a right conclusion as to the legal status of the parties, Schmidt, Horton, and Traynor being coadventurers in the project

when the discovery of ore was made by the two latter on March 1, 1927. The facts bring the case within the doctrine of joint adventure as recognized in the following decisions of this court and by the great weight of authority elsewhere: Botsford v. Van Riper, 33 Nev. 156, 110 P. 705; Gamble v. Hanchett, 35 Nev. 319, 133 P. 936; Lind v. Webber, 36 Nev. 623, 134 P. 461, 135 P. 139, 141 P. 458, 50 L. R. A. (N. S.) 1046, Ann. Cas. 1916A, 1202; Miller v. Walser, 42 Nev. 497, 181 P. 437; 33 C. J. 845–847; 3 Lindley on Mines (3d ed.), sec. 858.

■  It is insisted that the agreement was never executed. We cannot agree to this. Schmidt's testimony taken as true, which we are bound to assume, shows that the mutual promises of the parties had been exchanged, labor and supplies contributed by Schmidt, and the common enterprise fairly launched by the activities of the parties in endeavoring to promote its objects. That Schmidt was not permitted to assist in that on March 1, the day of the strike, was not due to his fault and was over his protest. Nevertheless, the agreement was reiterated on that morning and Schmidt's property was actually used in promoting its objects. This constitutes an execution of the agreement. Miller v. Walser, 42 Nev. 497–511, 181 P. 437.

■■  It is insisted that Horton effected his withdrawal from whatever agreement he may have had with Schmidt prior to March 1 when he took offense at the latter's remark about his not being barred from working on the Traynor automobile, and declared that he would have nothing more to do with Schmidt. Counsel for appellants cite a number of authorities to the effect that where no time is specified in the life of a partnership the partnership can be terminated at will under equitable restrictions. We do not deny the principle stated, but it does not fit the facts of this case. Horton could not under any equitable consideration effectually withdraw from the agreement and still avail himself of the fruits of Schmidt's labor and material furnished in pursuance of the objects of the

agreement. This the evidence shows that he did without offering to make any adjustment of Schmidt's contribution to the joint adventure. When Schmidt asked him as to this matter, he made no reply whatever. The rule in such cases is that a severance of the partnership relation must be clearly established. Costello v. Scott, 30 Nev. 43, 93 P. 1, 94 P. 222. The evidence does not have that force. It must also be borne in mind that Traynor attempted no withdrawal from the agreement. So, even though it were conceded that Horton had effectually withdrawn prior to the last Weepah expedition, Schmidt's equity in Traynor's share of the discovery would have been unaffected.

The trial court found that when Traynor and Horton used the partnership equipment on their trip to Weepah on March 1, 1927, Horton rescinded, revoked, and canceled his notice and declaration of withdrawal from the partnership theretofore made on February 17, 1927. The evidence supports this finding.

There is no merit in the contention that Schmidt abandoned the agreement. On the contrary, the evidence shows that he manifested a very lively desire to remain in the venture. His going to the vicinity of the strike on March 5 and 6 and locating claims there is not evidence of abandonment. It is evidence of nothing more than the urge which caused all the others to flock to the scene of the new strike and endeavor to secure valuable property by location. The fact that he did not locate his associates in with him is justified by their action in seeking to exclude him from a community of interest with them.

The answer, as has been stated, sets up the fact of the minority of Traynor and Horton during all the times mentioned in the complaint, and thereby repudiates generally any contract which may have been entered into by them with Schmidt, and particularly the contract on which Schmidt seeks to establish a resulting trust in his favor, as to the mining claims involved or the proceeds therefrom. They make this contention in their briefs. In this regard the trial

court said: "It is a fact Horton Jr. and Traynor were minors * * * at the time the discovery was made, and it is likewise a fact Schmidt was also a minor * * * and is therefore entitled to the same protection by the court as the other two. The enterprise they engaged in was highly commendable, and Horton Jr. and Traynor reaped the benefits, but are now making an effort to avoid their obligations. This they cannot do in fairness to Schmidt, who performed labor and furnished equipment, thereby enabling them to use the car to go to Weepah. Schmidt is entitled to an equal share with his two associates, Horton Jr. and Traynor."

The trial court applied a right principle. Pinnell v. St. Louis-S. F. R. Co. (Mo. Sup.) 263 S. W. 182, 41 A. L. R. 1092; Peers v. McLaughlin, 88 Cal. 294, 26 P. 119, 22 Am. St. Rep. 306; State ex rel. Stempel v. New Orleans et al., 105 La. 768–770, 30 So. 97.

The facts bring the case within an exception to the general rule. The privilege which the law accords to infants of disaffirming their contracts under certain conditions is for the purpose of their protection, and in so far as it serves that purpose is a just and necessary rule. But the privilege ought not in justice to be preserved where, instead of serving as a shield to one of immature judgment and discretion, it is used as an instrument of oppression. More particularly is this true where, as in this case, such other was at the time of his contract himself under the age of majority, and the contract entered into advantageous to all parties. In other words, the facts show a case where the reason of the rule fails entirely. It is a trite expression of a principle of universal application that, when the reason of a rule fails, the rule itself is not applicable. We hold therefore that the defense of infancy is not available in this case.

Appellants' counsel assigned a number of other errors, including errors claimed in court rulings on the admission of testimony, most of which were not touched by him in his oral argument on the hearing in this court. We have not assumed, therefore, that these were waived

by counsel, but have considered them all and find them to be without merit.

The judgment and order denying the motion for a new trial are affirmed.

COLEMAN, J.: I concur.

SANDERS, J., dissenting:

Admittedly, this suit is the outgrowth of a mining excitement — short lived, but very sensational during the few weeks it lasted. The excitement was occasioned by a discovery made by the defendants of a fabulously rich surface deposit or pocket of gold upon the property of the Electric Gold Mines Company in the Weepah mining district, Esmeralda County, Nevada. Upon the strength of the discovery, the defendants, in anticipation of the rush to follow, staked a large number of mining claims adjacent to and surrounding the place of discovery for speculative purposes only. At the height of the excitement the defendants readily disposed of a number of their locations to individuals and corporations. · The locations standing in the name of the defendants and the proceeds derived from the sale of certain of their locations form the subject of this suit.

The suit was brought for the purpose, among other things, of obtaining a decree determining that the plaintiff Schmidt is a one-third owner with defendants Horton and Traynor in the locations standing in the name of the defendants in the Weepah district.

The object of the suit was, among other things, to impress upon said locations, and the proceeds received from the sale of certain of the locations, a trust in favor of the plaintiff.

The plaintiff sought by his complaint to establish a claim or right to a one-third undivided interest in all said locations under and by virtue of an agreement entered into between the parties on the 5th day of February, 1927, to locate mines upon the public domain by their joint aid, effort, labor, and expense, whereby each was to acquire, by virtue of the act of location, an equal undivided one-third interest.

In order for plaintiff to obtain the relief demanded in his complaint, the burden was upon him, first, to establish the agreement by clear and satisfactory proof; and, second, to establish that the agreement had not been annulled in any way, and that it was in full force and effect when the locations were made. Craw v. Wilson, 22 Nev. 385, 40 P. 1076; Costello v. Scott, 30 Nev. 43, 93 P. 1, 94 P. 222; Lawrence v. Robinson, 4 Colo. 567; Johnstone v. Robinson (C. C.), 16 F. 903.

Much of the briefs are devoted to the discussion of the nature and character of the agreement which constitutes the basis of the plaintiff's cause of action. The trial court was of the opinion that the evidence establishes a joint adventure, grubstake, and partnership agreement existing between the parties on March 1, 1927, the date of the discovery made by the defendants at Weepah. In my judgment, the evidence establishes a prospecting partnership between the parties, not limited as to time or place, to locate mines upon the public domain by their joint aid, effort, labor, and expense, whereby each was to acquire an equal interest in all locations wherever made under the agreement. Such an agreement is distinguishable from a joint adventure, a grubstake contract, or mining partnership. 40 C. J. 1154. But whatever the name, in order to give to the parties associated an interest in the locations, the association must have existed at the time the discovery and locations were made.

The important question, therefore, is whether the locations here in controversy were made under the prospecting partnership. It is well settled that a prospecting partnership without limit as to the time of its continuance is determinable, subject to equitable restrictions, at the pleasure of any of the parties. Lind v. Webber, 36 Nev. 623, 134 P. 461, 135 P. 139, 141 P. 458, 50 L. R. A. (N. S.) 1046, Ann. Cas. 1916A, 1202; Lawrence v. Robinson, supra; 40 C. J. 1155.

My dissent from the majority opinion in this case rests upon what I consider to be erroneous conclusions of law deduced from the trial court's findings of fact

relating to the question of whether or not the locations which form the subject of the suit were made under the partnership. The court expressly .found as a fact that the defendant Horton withdrew from the partnership on February 17, 1927. That thereafter, to wit, on February 20, 1927, the plaintiff Schmidt and the defendant Traynor, believing that Horton had withdrawn from the partnership and acting independently of it, made a trip to the Weepah district in company with one Crumley in the latter's automobile, where they located six claims, covering ground that had been examined by Schmidt and Horton prior to Traynor's admission on February 5, 1927, into the partnership. The trial court, however, concluded from its findings of fact: First. "That Horton's purported and pretended withdrawal from the partnership on February 17, 1927, was ineffectual, inoperative and of no legal effect." Second. "That when Horton and Traynor used the partnership equipment on their trip to Weepah on March 1, 1927, Horton rescinded, revoked and canceled his notice and declaration of withdrawal theretofore made on February 17, 1927."

I can conceive of no better proof to show that Horton's withdrawal from the partnership was not pretended, ineffectual, and of no legal effect than the acts of the parties themselves. It appears that three days after Horton's withdrawal, Schmidt and Traynor, believing that Horton was no longer a partner and acting independently of the partnership, located with a third party a number of claims in the Weepah district. There is no evidence whatever to show that Horton's withdrawal was subsequently abrogated, other than the uncorroborated and self-serving declaration of Schmidt as a witness in his own behalf, unless, as concluded by the learned trial court that Horton's use of "partnership equipment" on the trip made by Horton and Traynor to Weepah on March 1, 1927, as a matter of law amounted to an abrogation of Horton's withdrawal from the partnership made on February 17, 1927, therefore the discovery and consequent locations in controversy were made under the partnership. I am not in accord with

this conclusion. The expression "partnership equipment," as used in the conclusion of law, is ambiguous and to some extent misleading. If by "partnership equipment" was meant the "Traynor Bug," the conclusion is clearly erroneous for the reason that the "Traynor Bug" was not a partnership asset. It belonged to Traynor. It is true that the "Traynor Bug" was reconditioned by placing thereon certain parts taken from the so-called "Dutch Bug," consisting of battery and tires, but these parts were in no sense equipment furnished by the partnership. On the contrary, Schmidt considered that upon Horton's withdrawal the parts mentioned became his property under the contract for which he sought an accounting. In my judgment, Horton's positive and unequivocal withdrawal from the partnership on February 17, 1927, was not abrogated or affected by his use of the "Traynor Bug" in making the discovery on March 1, 1927. Such a strained conclusion is not sufficiently strong to impress the locations standing in the name of Horton and Traynor, or the proceeds from the sale thereof, with a resulting trust in favor of Schmidt.

The plaintiff having failed to establish that the locations were made under and by virtue of the partnership agreement, I conclude that the judgment or decree should be reversed, with directions to dismiss the action.