LOUIS SEUFERT v. JAMES M. GILLE, Appellant.

Division Two, July 19, 1910.

1. **PARTNERSHIP: Dissolution: Transfer of Assets to Corporation.** A mercantile partnership, organized for the purpose of buying and selling goods, whose members organize a corporation to carry on the business, and transfer to it its entire stock of goods, and which thereafter ceases either to buy or sell goods, is in law dissolved.

2. ———: ———: ———: **Execution of Notes: Notice.** The execution of a note in the firm name by one partner, after dissolution, without notice of the dissolution to the payee, given for money borrowed to pay firm debts, is binding on the other partners; and a note given in renewal of such note, by said partner, though the other partner had no knowledge that such original note was given or of its renewal, is binding upon such other partner, if the payee had no notice of the dissolution. But if the payee had notice of the dissolution, a note executed thereafter, and any renewal thereof by the one partner after the payee had notice of dissolution, is not binding on the other partner.

3. ———: ———: Notice: Actual Knowledge: Fact for Jury. Where the evidence is conflicting on the point of whether the payee had notice that the partnership was dissolved at the time one partner, without knowledge of the other, executed the note sued on, the question of whether or not the payee had notice becomes an issue for the jury. But there is no need of a published public notice brought home to the payee, if he had actual knowledge of the dissolution.

4. ———: ———: ———: Implied Sanction. Even though the payee of a note knew that the firm had been dissolved when he received the firm's renewal note executed by one of the partners, the other partner is liable if it was renewed in the name of the firm with his express assent or implied sanction.

5. ———: ———: Implied Authority: Instruction. An instruction should not submit to the jury a purely legal question. Where one of the issues is, in a suit on a renewal note, whether the note was executed in the name of the dissolved firm by one of the partners with the implied sanction of the other (the defendant), an instruction which merely tells the jury that if they find and believe from the evidence that said partner "had authority from defendant to sign the firm name to said note, their verdict will be for plaintiff," is reversible error. It should have stated what facts would constitute such authority.

6. ———: ———: ———: Other Notes as Evidence: Compromise. The fact that the defendant partner, after the note in suit was executed by his former copartner, settled another note to another payee, also executed by the same copartner long after the firm had been in law dissolved, at what he supposed was something less than its face value, tends to establish a recognition on defendant's part of authority in his copartner to sign the partnership name to notes; and hence said other note was admissible in evidence as tending to establish his implied sanction of the execution of the note sued on. Such other note is not inadmissible simply because defendant settled the note out of sympathy for the young lady who held it, or settled it by way of compromise by assigning a note for a less amount made payable to the firm for a debt contracted prior to the dissolution and secured by a mortgage. The rule that testimony of attempts to compromise suits is not admissible is not applicable to such a case; it pertained not to the note in suit, but to another note.

7. ———: ———: ———: To Execute Firm Note: Indorsed Notes as Evidence. In a suit on a note executed by one partner in the name of the partnership, after its dissolution in law, and after the formation of a corporation with the firm assets as its

capital, notes signed by the corporation and indorsed by the same partner in the name of the firm without the defendant partner's knowledge, are not admissible in evidence to show a course of business. Authority to execute notes in the name of a firm does not imply authority to indorse the firm's name on a third party's notes.

8. ——: ——: ——: **Evidence of Power to Borrow Money.** Where the suit was on a note executed in 1902 by one of the copartners, without the knowledge of the other, testimony that the said partner borrowed money in the name of the firm in 1893, after the transfer by the firm in 1891 of its assets to a corporation formed to conduct the business, and that later notes were given in the name of the firm by this partner for this borrowed money, and that they were renewed from year to year until consolidated in the note sued on, in connection with testimony by said copartner that he had told defendant that the firm had borrowed money of the plaintiff payee and that defendant had once said he would like to see plaintiff paid, is competent, not as establishing the consideration of the note, but as tending to establish defendant's implied assent to his copartner's attempt to bind the firm on the note sued on.

9. ——: ——: ——: ——: **Instruction.** But where the issue was whether said copartner had authority in 1902 to sign the firm's name to the note sued on, an instruction which submitted to the jury his authority to borrow money in the firm's name in 1893 was error.

10. ——: ——: ——: ——: **Instruction: Circumstances, etc.** An instruction, in a suit on a note against a copartner where the issue is the authority of another partner to sign the firm's name to the note sued on, which tells the jury that defendant's implied sanction of such partner's authority to execute the note in the firm's name may be implied from "all the facts, circumstances, course of business and dealing between said partners detailed in evidence," is erroneous in that it does not tell the jury what facts would establish defendant's implied assent.

Appeal from Jackson Circuit Court.—*Hon. W. B. Teasdale,* Judge.

REVERSED AND REMANDED.

*R. H. Field* for appellant.   ·

(1)   The court erred in allowing the partnership of Gille and Van Peyma to be treated as a legitimate issue in this case; and erred in overruling defendant Gille's objection to the evidence of such partnership; and erred in the reference to such partnership in instructions 2 and 4 given for plaintiff, as an issue in the case, as the evidence of the plaintiff showed, and he admitted, that he knew that Gille and Van Peyma were not a trading partnership on July 1, 1902, the date of the note sued on, and for eleven years prior thereto. Deardoff v. Thacher, 78 Mo. 128; Stavnow v. Kenefick, 79 Mo. App. 41; Randall v. Lee, 68 Mo. App. 565; Third National Bank v. Shoe Co., 115 Mo. App. 46; Lee v. National Bank, 45 Kas. 8.   (2)   The court erred in refusing to give instruction 5 to the jury, asked by defendant Gille.   The legal effect of the above cited evidence and admissions of the plaintiff was to eliminate the issue of the Gille and Van Peyma partnership at the time in question; and the defendant Gille had a right to have the jury so told, as in instruction 5 asked by him, that Gille and Van Peyma were not a trading firm and that the plaintiff knew that they were not a trading firm when Van Peyma signed the note sued on. Evans v. Foreman, 60 Mo. 453; Tyler v. Hall, 106 Mo. 323; Young v. Ridenbaugh, 67 Mo. 574; Estes v. Shoe Co., 155 Mo. 578; Bank v. Murdock, 62 Mo. 74.   The court likewise erred in refusing instructions 16 and 17, asked by defendant Gille, that Seufert had no right to suppose, without assurance from Gille, that Van Peyma was authorized to write Gille's name on the note sued on or on any of the renewal notes given by Van Peyma to plaintiff, and also that it was the business of Seufert before accepting these notes from Van Peyma, to learn from Gille, himself, of Van Peyma's authority to write Gille's name thereon.   Mechanics Bank v. Schaumberg, 38 Mo. 244; Watts v. Devoe, 1

Grant's Cas. (Pa.) 267; Hefferman v. Boteler, 87 Mo. App. 316. (3) The court erred in the instructions given to the jury at the request of the plaintiff, as follows: (a) Instructions 2 and 4, imply the right of the jury to consider the firm of Gille and Van Peyma as a going concern on July 2, 1902, the date of the note sued on. (b) Instruction 2 submitted to the jury the acquiescence of Gille in the borrowing, by Van Peyma, of money upon the signature of Gille and Van Peyma, after Gille and Van Peyma had ceased to be a trading concern. This was error. First: Because there was no allegation of such acquiescence by Gille in either the petition or reply filed in this case. Bank v. Murdock, 62 Mo. 73. Second: Because there is no evidence of Gille's acquiescense in such borrowing, as a course of business. Third: Because the issues framed and submitted in this instruction, as to Van Peyma's borrowing money on the signature of Gille and Van Peyma and Gille's acquiescence therein, obscured the real issue of fact on the first count in the petition, to-wit, Van Peyma's authority to sign the note sued on. (c) Instructions 1, 2, and 3 require or permit the jury, in determining Van Peyma's implied authority to sign Gille's name to the note sued on, to take into consideration all of the facts and circumstances detailed in the evidence. This was error in plaintiff's instructions, because it turned the jury loose to decide the issue as to Van Peyma's authority to sign Gille's name on the note sued on, on the relevant and irrelevant testimony in the case hereinafter noted. (4) The court erred in allowing the plaintiff to prove the consideration of the note sued on; also that the original consideration was money borrowed by Van Peyma for Gille and Van Peyma. The plea of *non est factum* to the note sued on, was the only issue made on the pleadings in the case. This plea went only to the signing of Gille's name to the alleged promissory note, it did not go to the consideration or raise any issue thereon. State ex rel. v.

Crousbaurer, 68 Mo. 254; Farmers' Bank v. Bayliss, 41 Mo. 275; State to use v. Ferguson, 9 Mo. 288.  (a) The admission of this evidence, when there was no plea of want of consideration, violated the first rule of evidence, to-wit, the "evidence must be confined to the point in issue." Greenleaf, Ev., sec. 51.  The reason of the rule is, that evidence upon any undisputed matter necessarily tends to draw the minds of the jurors away from the point in issue and to excite prejudice and to mislead them.  1 Greenleaf, Ev., sec. 52; Bank v. Murdock, 62 Mo. 74; Ritter v. Bank, 87 Mo. 574.  (b)   The consideration of the note sued on was itself a cause of action, but a different and independent cause of action from the alleged promissory note, and could not be prosecuted without surrendering up the promissory note itself.  Brown v. Chadwick, 32 Mo. App. 615; O'Bryan v. Jones, 38 Mo. App. 91; Schepflin v. Dessar, 20 Mo. App. 569; Brooks v. Mastin, 69 Mo. 58; McCormick v. Railroad, 154 Mo. 191; Bertiauz v. Dillon, 20 Mo. App. 603; Farmers' Bank v. Bayliss, 41 Mo. 275; Belle v. Morrison, 1 Peters 373; Bright v. Judson, 47 Barb. (N. Y.) 29. (c)  In a suit on the loans the burden of proof would be upon the plaintiff to prove the same.  In the suit on the note the burden of proof would be upon defendant to make an issue as to the consideration thereon. The plaintiff would not have to allege or prove the consideration for the note.  Rector v. Fornier, 1 Mo. 204; Caples v. Branham, 20 Mo. 248; Glascock v. Glascock, 66 Mo. 629; Taylor v. Newman, 77 Mo. 257; County of Montgomery v. Auckley, 92 Mo. 126.  (d)   To allow the execution of this note to be proved by proof of the original consideration claimed for the promissory note sued on, is to allow the plaintiff to sue upon one cause of action and sustain it by proof of another cause of action, and violate the established rule in this State, that a party cannot sue upon one cause of action and prove another or recover upon another cause of

action.  Clements v. Yates, 69 Mo. 623; Brown v. Chadwick, 32 Mo. App. 615; Price v. Railroad, 40 Mo. App. 189; Wesby v. Bowers, 58 Mo. App. 419; Belle v. Morrison, 1 Peters 373; Baer v. Terry, 108 La. Ann. 597; Sheldon v. Adams, 41 Barb. (N. Y.) 54.  (5)  The court erred in allowing the plaintiff to prove that the claimed loans of plaintiff to defendants were credited in the account of Gille and Van Peyma in the books of the Gille Hardware and Iron Company and were the original consideration of the note sued on.  First, because this book account was collateral and irrelevant to the issue in the case, and therefore should have been excluded.  Second, because there is no evidence that Gille had any knowledge thereof.  Rimel v. Hayes, 83 Mo. 208; Hefferman v. Boteler, 87 Mo. App. 316; Alt v. Grosclose, 61 Id. 461; Bank v. Murdock, 62 Mo. 74.

*Ward, Hadley & Neel* and *A. L. Cooper* for respondent.

(1)  One member of a dissolved trading partnership can bind the partnership and the members thereof on a promissory note where no notice is conveyed to the lender of a dissolution of the partnership, where the lender, prior to the dissolution, knew of the existence of the partnership. Bank v. Schoen, 123 Mo. 657; Holt v. Simmons, 16 Mo. App. 113; Knaus v. Givens, 110 Mo. 63; Dowzelot v. Rawlings, 58 Mo. 76; Pope v. Risley, 23 Mo. 187; Lindley on Partnerships, sec. 403, p. 559; Story on Partnership, sec. 160, note 1.  And the question of notice or no notice is a question for the jury.  Osborn v. Wood, 125 Mo. App. 255.  (2)  And some authorities say the partnership may be bound even though the lender was a stranger to the partnership, if he be without notice of dissolution.  St. John v. Montgomery, 68 Mo. App. 423.  (3)  Where a man advisedly permits the representation that he is a member of a partnership, or so represents himself, to a per-

son who is doing business with the firm, he will be treated as a partner as to that person. Gambel v. Gether, 108 Mo. App. 343. (4) Although there may have been a dissolution of a trading partnership, one member can bind the firm and all of the members thereof to a third party on a promissory note, provided authority is given such partner signing by partner attempted to be held, whether the third party have notice or not. Midland Nat. Bk. v. Schoen, 123 Mo. 658; Tilford v. Ramsey, 37 Mo. 566; Long v. Story, 10 Mo. 398. (5) And such authority can be shown by a course of dealing between the partners and others, and need not be express authority. Midland Nat. Bk. v. Schoen, 123 Mo. 657; Gates v. Watson, 54 Mo. 591; Rippey v. Evans, 22 Mo. 158; White v. Hudson, 36 S. W. 332; Holt v. Simmons, 16 Mo. App. 109. (6) The question of partnership is in reality a question of agency, and agency may be created by express words or acts of the principal, or it may be implied from his conduct and acquiescence. Sharp v. Knox, 38 Mo. App. 175; Cummings v. Hurd, 49 Mo. App. 145; Hull v. Jones, 69 Mo. 587; Mitchum v. Dunlap, 98 Mo. 421; McGinniss v. Mitchell, 21 Mo. App. 497; Johnson v. Hurley, 115 Mo. 520. (7) Notice to the agent is notice to the principal. Livermore v. Blood, 40 Mo. 52; Meier v. Blume, 80 Mo. 183. (8) By a course of dealing, parties may become partners as to third parties although they may not be partners between themselves. Bissell v. Warde, 129 Mo. 451; Young v. Smith, 25 Mo. 346; Gates v. Watson, 54 Mo. 591; Campbell v. Hood, 6 Mo. 217; Rippey v. Evans, 22 Mo. 158. (9) And it is not necessary to show authority to sign the particular note in suit. If authority had been given it was sufficient for the renewals. Midland Nat. Bk. v. Schoen, 123 Mo. 658; Tilford v. Ramsey, 37 Mo. 566; Dyer v. Murdock, 38 Mo. 224. (10) The question of authority of one partner to bind a partnership, is a question for the jury under proper instructions. Midland Nat. Bk.

v. Schoen, 123 Mo. 659; Osborn v. Wood, 125 Mo. App. 255. (11) Though evidence of partnership may be slight, still when submitted to a jury under proper instructions, the court will not interfere with their finding on that question. Klem v. Rathbun, 36 Mo. App. 203. (12) Partners, if liable at all, are liable jointly and severally for the whole debt. Lowe v. Springs Co., 47 Mo. App. 429; Simpson v. Schulte, 21 Mo. App. 644; Gates v. Watson, 54 Mo. 590. (13) Even though a fraud is being practiced by one partner on another, still it will be held, if the third party is no party to the fraud, and where one of two innocent persons must suffer by the act of a third party, that he shall suffer who has been the cause or occasion of the confidence and credit reposed in such third person. Hayner v. Crow, 79 Mo. 296. (14) Although plaintiff may have testified to seemingly inconsistent statements, his meaning is a question for the jury, and the view of the evidence most favorable to the plaintiff must be adopted. Lehner v. Railroad, 110 Mo. App. 219; Cohn v. Kansas City, 108 Mo. 392; Schermerhorn v. Herold, 81 Mo. App. 464; Halpin v. Manny, 33 Mo. App. 393; Rheinhardt v. Grant, 24 Mo. App. 158; 1 Am. & Eng. Ency. Law (2 Ed.), p. 724. (15) Knowledge of the formation of a corporation by parties who have been in a partnership does not necessarily impute notice or knowledge of dissolution of partnership. First Nat. Bk. v. Conway, 67 Wis. 213; Dellaprozzar v. Foley, 44 Pac. 727. (16) Nor is knowledge of change of name, knowledge or notice of dissolution of partnership. Coggswell v. Davis, 65 Wis. 194; Roof v. Morrison, 37 Ill. App. 37.

FOX, J.—From August, 1885, to June, 1891, James M. Gille and James Van Peyma were partners as hardware merchants in Kansas City, Missouri, and did business under the firm name of "Gille & Van Peyma." The partnership was an unlimited one, each partner

having an equal share therein, and it did a general wholesale and retail hardware business. The business of the firm was largely done by Van Peyma, who was its active manager, and to him was left its banking business and the borrowing of money in its name. In June, 1891, a corporation was formed with James M. Gille, James Van Peyma and others as stockholders, under the name of Gille Hardware & Iron Company, and the merchandise stock of the partnership was transferred to the corporation and constituted in part its assets or capital stock. In July, 1893, Van Peyma borrowed from plaintiff, Louis Seufert, who was a farmer living near Leavenworth, in Kansas, $2000, and both Van Peyma and plaintiff say Van Peyma gave a note for that amount to plaintiff which Van Peyma signed "Gille & Van Peyma, James M. Gille, James Van Peyma." Van Peyma says he turned the money over to the Gille Hardware & Iron Company, and credited the amount on the account of Gille & Van Peyma, which was being carried on the books of the corporation. On April 27, 1894, Van Peyma says he, in the name of Gille & Van Peyma, borrowed $1130 from plaintiff, gave the firm's note, turned the money over to the corporation and credited the amount in like manner to said firm. This last transaction took place in the store where the corporation did business. The partnership account remained on the books of the corporation until 1902, and these notes were renewed at the same store, possibly annually, at least from 1896, by Van Peyma, who signed the firm's, his own and Gille's names thereto, interest at eight per cent being calculated and added to the principal, until 1901, when they were combined in one note, which note was renewed July 1, 1902, and which renewal note is the note sued on, and which at the time amounted to $5150.86. It was signed "Gille & Van Peyma, Jas. M. Gille, Jas. Van Peyma," and all the signatures were made by Van Peyma.

The defendant Gille denied the partnership at the time the note was given, and disputes Van Peyma's authority to execute the note, and disputes his liability both individually and as a partner of Van Peyma; and that is the real issue in the case. Both Gille and Van Peyma are defendants in the case, but Van Peyma admitted the partnership and the signatures, and at the trial was plaintiff's principal witness.

The questions of the existence of the partnership and of Van Peyma's authority to sign the firm name and Gille's name to the note were submitted to the jury, which returned a unanimous verdict against both defendants. Gille alone appeals.

The contention of appellant that the partnership had been dissolved, that it no longer existed when the note was given, and that Van Peyma had no authority to sign the firm name thereto, calls for a further elaboration of the facts. It may clarify the situation and narrow the issues to legal channels to state that plaintiff does not contend that Van Peyma had any authority to bind Gille individually and separately from his relationship as a partner; but he only contends that he had authority as a partner of the firm of Gille & Van Peyma to bind Gille, and that he signed Gille's name to the note with the intention of binding him as a partner and not otherwise.

James M. Gille and James Van Peyma had formerly resided at Leavenworth, Kansas, and Gille conducted a mercantile business there and had bought goods through Van Peyma who was a salesman for some wholesale hardware house. Plaintiff Seufert resided about seventeen miles from Leavenworth and he and Van Peyma had known each other for years, and had been friends in New York prior to taking up their abode in Kansas in about 1868. Gille had a slight acquaintance with Suefert, who traded with him in a small way at his store. In 1885 Gille and Van Peyma formed a partnership as hardware merchants, under

the firm name of Gille & Van Peyma, and had a store on Union avenue in Kansas City, Missouri. This business they conducted at that store until about 1890, when they moved to another at Santa Fe and St. Louis avenues, and continued to do business there as a partnership under the same name until (at least) June 1, 1891. During these years plaintiff bought some goods from the firm, occasionally was at their store, both as a visitor and a customer, but they borrowed no money from him. Van Peyma did borrow money in the name of the firm from banks, and gave the firm's notes, and some of these notes Mr. Gille thought he executed, but could recall no specific one. The checks were signed, in the main, by Van Peyma.

On June 1, 1891, the corporation, Gille Hardware & Iron Company, was organized with a capital stock of $150,000. Of this stock $60,000 was issued to Gille, $30,000 to Van Peyma, and Gille gave $5000 of his stock to his son, Henry S. Gille, and sold $5000 to W. H. Adams, and Van Peyma about 1892 or 1893 sold $5000 of his stock to Charles Seufert, plaintiff's son. The balance of the stock ($60,000) was issued to W. F. Hall, E. F. Townsend, H. M. Evans, and $35,000 of it to A. D. Bayless, and possibly some others got some. About this time the firm bought a stock of hardware from another concern, which is styled the "Halls & Wills" stock, amounting, so some of the witnesses say, to $100,000, but how it was paid for, whether by the money of Gille or that of Gille & Van Peyma, or whether it was paid for by this $60,000 of stock, or by money of the corporation, the evidence fails to reveal. It does show, however, that Gille put some money into the corporation, and that may explain why twice as much stock was issued to him as was issued to Van Peyma. The entire stock of merchandise belonging to the firm of Gille & Van Peyma was turned over to the corporation, and in payment thereof the certificates of stock above mentioned were issued to Van Peyma and Gille, individ-

ually.    The inventory of the partnership on June 1,
1891, amounted to $184,253.90, and that represented
the stock of merchandise turned over to the Gille
Hardware & Iron Company.   After that time the cor-
poration continued to do a general mercantile busi-
ness, both wholesale and retail, at the store at Santa
Fe and St. Louis avenues, and later, but at just what
date does not appear, moved to Walnut street, and
continued to do business there until it made an assign-
ment in January, 1903.

When the stock of merchandise of the firm was
turned over to the corporation on June 1, 1891, the
partnership of Gille & Van Peyma ceased to buy and
sell goods.   It owed debts and debts were due to it,
and Van Peyma testified that at that time the corpora-
tion was indebted to the partnership, in an amount
which he places at twenty or twenty-five thousand
dollars, and that "the corporation was in our debt for
a long time;" but he also says that when he got the
money from plaintiff the partnership was "heavily in
debt to the corporation," that "things had changed,"
and that after the corporation was formed the part-
nership did nothing except collect money owing it, pay
its debts and handle a little real estate on which the
firm held mortgages.

Upon the books of the corporation an account, un-
der the firm name of Gille & Van Peyma, was opened
with the corporation.   The pages of the ledger show-
ing that account (under one name and another, as
will hereafter be shown) are set out in the record.
On the right-hand side of the pages are shown what
was credited to the firm by the corporation or what
was paid to the corporation by the firm, and on the
left-hand side are shown what was charged to the
firm by the corporation.   It begins on the left-hand
side with an item of July 10, 1891, "Cash $166.67."
On August 4, 1891, is another item, "Cash, $166.67."

230 Sup—30

That item in the same amount is entered as cash each month until January 6, 1892, when it is entered, "Rent, $166.66." It continues to be entered as 'Rent, $166.67" each month thereafter down to December 19, 1893. It is difficult to see how a firm which was neither buying nor selling goods, and had no goods, could have been indebted to the corporation for rent each month for thirty months in the sum of $166.67, or $5000. But let that pass. It is mentioned to show that this book account has in it many items that are unintelligible, and that it will bear close inspection; yet Van Peyma says, "I swear by the books," and at another place, when pressed to explain certain items in the account, he says he knows nothing about the books; he left them to the book-keepers. But take the books as they stand. The first money ($2000) was borrowed on July 19, 1893, and Van Peyma says and plaintiff claims this item was entered on this account July 22, 1893. This book account from its beginning down to and including July 22, 1893, shows on the debit or left-hand side, a total of $113,487.02, and on the credit side $191,112.41. In other words, the book account, if it were balanced on July 22, 1893, shows that the corporation on that date owed the firm $77,625.39, and hence it is claimed the firm was not indebted on that date to the corporation or to any one else. But further down in the account on the debit side the firm is charged on December 30, 1893, with "Capital stock, $90,000." The account shows no charge prior to that time of the $90,000 of the capital stock of the corporation issued to Van Peyma and Gille, and hence we conclude it should have been charged on June 1, 1891, and if that had been done this account would have shown the firm to be indebted to the corporation on July 22, 1893, in the sum of $12,374.61. The second loan was on April 27, 1894. On that date this book account shows that the firm was indebted to the corporation in what would be a net balance of $15,722.04.

On this book account the partnership is charged with $5000 cash on September 7, 1891; $25,000 cash ,on September 8, 1891; $3000 cash on September 30, 1891; $2000 cash on August 25, 1891; $3000 cash on November 24, 1891; $1500 cash on December 5, 1891; and $19,118.37 cash on June 8, 1892. It also shows that one note for $10,000 was charged to the partnership on September 12, 1891, and another for $11,000 on September 14, 1891, but the names of the payees of the notes are not given, and there is nothing to identify them. No attempt was made to explain any of these items by either side. These cash payments and these two notes and more than $5000 of rents charged to the firm, together with the $90,000 in stock, make up the great bulk of the debit side of this account. Here was over $58,000 in cash charged to this partnership and credited to the corporation and there is not one word of testimony to indicate that any part of that "cash" was used to pay the debts of the firm or that it ever received a dollar of it, and the very fact that six of these items were in round numbers would indicate that they were not used to pay accounts, and is far from sustaining a belief that they were so used. They, together with the rent charge, tend to impeach the integrity of the account itself. Besides, it should be remembered that this account does not appear on the books of the partnership, but is an account which the corporation opened and kept with the partnership, and the corporation alone charged up these items to the partnership. They all tend to show that when the corporation paid out money or borrowed money Van Peyma simply had the amount charged to the partnership.

On July 19, 1893, Van Peyma went to see plaintiff on his farm in Kansas. He testified: "I went to him and told him we needed some money. . . . I told him $2000 would be enough. He gave me that draft for $2000 on the Leavenworth bank. That money was.

deposited to the credit of Gille & Van Peyma on our books. . . . I obtained that draft from Louis Seufert. I turned it over to the Gille Hardware & Iron Company to be credited to Gille & Van Peyma for money we owed them.'' On cross-examination he testified: ''Q. Did you tell him when you borrowed the money that Gille Hardware & Iron Company had been formed, and that Gille & Van Peyma had quit buying and selling goods? A. Yes, sir; I told him I can make the note either one way or the other, Gille Hardware & Iron Company or Gille & Van Peyma, but it would be safer for him to make it Gille & Van Peyma, because the Gille Hardware & Iron Company would have to fail before Gille & Van Peyma would, and then we were in debt to the company, it looked bad, the panic of 1893, you know; so that is the way we got that money and turned it into the company for the debt we owed them. Q. So you told Mr. Seufert then that at that time Gille & Van Peyma had been succeeded in business by Gille Hardware & Iron Company? A. Yes, sir.''

The plaintiff's son owned $1500 of the stock of the company, but whether he owned it at the time this money was borrowed is uncertain. No one testified about the matter except Van Peyma and he says in one place that he acquired it two or three years after this transaction with plaintiff, and in another that he bought it from him in 1892 or 1893. At any rate the testimony is undisputed that this son, at the time this money was borrowed, was in the employ of the company at its store, and had been with it and the firm for some time.

Over the objections and exceptions of defendant to plaintiff's testifying as to what Van Peyma said to him in the absence of defendant Gille, plaintiff said of this transaction: ''Mr. James Van Peyma came to my residence and wanted to know if I had any money. I says, 'What is the matter?' and he says

'Mr. Gille is a vast property-owner, and they haven't any money.' Q. Who needs money? A. Mr. Gille and Mr. Van Peyma. I expect one of them needed some money in the time of the panic and they could not get any money out of the banks and wanted to know if I could let them have money, and I told them I had money and if I had that amount in the bank I could loan them money. So we went out to Tonganoxie bank and found I had that amount and more, and I had a check on the First National Bank of Leavenworth and gave it to Mr. Van Peyma, and he said it was for Mr. Gille, and he gave me Gille & Van Peyma's signature, and I have had that signature on the note, when it was renewed it was given that way—Gille & Van Peyma. Q. You say he told you the money was for Gille? A. Yes, sir, that they asked it for Gille & Van Peyma. Q. I thought you said a moment ago Gille wanted this money? A. Gille & Van Peyma, the note was given Gille & Van Peyma. The note was headed with Mr. Gille." On cross-examination he testified: "Mr. Van Peyma came to me and said they were in need of money, that Mr. Gille was worth a lot of property, but that he could not get any money, that the property was not worth anything at the time because he could not get any money out of it, or out of the banks, and he said to me he would give me Gille & Van Peyma's signature, and I gave him $2000 on Gille & Van Peyma's signature. . . . Q. What did Mr. Van Peyma say they wanted it for? A. I suppose they had some bills coming in for goods, that they had to make payment. Q. For goods in the business? A. For the Gille Hardware & Iron Company. Q. That is what they needed the money for? A. Yes, sir, that is what they needed the money for. Q. Is that what Mr. Van Peyma said? A. Yes, sir, that is what I understood him." He further testified that Van Peyma did not at that time tell him anything about whether Van Peyma and Gille still continued as partners.

The evidence is clear that plaintiff knew at that time that the business was being done in the name of Gille Hardware & Iron Company; that "the name had been changed from Gille & Van Peyma." "Q. Had there been any change in the firm of Gille & Van Peyma, as far as you knew, at that time? A. When the note was given they were going under Gille Hardware & Iron Company. Q. Who did you understand owned the Gille Hardware & Iron Company at that time? A. I suppose the men who had stock in it." He testified that "they changed the name from Gille & Van Peyma to the Gille Hardware & Iron Company before the first of these notes was given;" that he learned that fact from Van Peyma in the office of the building in which the Gille Hardware & Iron Company did business, and that before the notes were given Van Peyma had told him the business was being done in the name of the Gille Hardware & Iron Company. He further testified, that before this $2000 was borrowed in July, 1893, he had on more than one occasion received bills and receipts for goods he had bought, and that they bore the name of the company only, and bills of that character were offered in evidence and were identified by him. On the other hand, he testified that he knew nothing about a corporation; that he thought the concern was still a partnership. His testimony on this point, on one view of it, amounts to this, that he knew that Gille & Van Peyma no longer did business in that name; that they had changed the name to Gille Hardware & Iron Company, and were doing business in that name. On the other hand he knew they were a company, that the stockholders owned it, and his son was a stockholder, possibly before the $2000 was borrowed, certainly long before the note in suit was executed; but while he knew they were a company, he did not know the company was a corporation.

The note for $2000 was not offered in evidence; but a draft for $2000, dated July 19, 1893, reading,

"Pay to the order of Lewis Seufert two thousand dollars in current funds," drawn by the Tonganoxie State Bank upon the First National Bank of Leavenworth, Kansas, and stamped paid by that bank on July 20th, was admitted in evidence. It is indorsed "Lewis Seufert" and "pay———or order for collection," and immediately after these words are indorsed: "Account No. 60,831 First Nat'l Bank, Kansas City, Mo. E. F. Swinney, Cashier." But the name of Gille & Van Peyma, or either of them, or of the Gille Hardware & Iron Company nowhere appears on that draft.

The ledger of Gille Hardware & Iron Company under the account headed "Gille & Van Peyma," on the credit side contains this entry: "1893. July 22, 17 $2000." That is the whole of that entry. Van Peyma testified that the figures "17" referred to the page of the cash book on which that item was first entered. On that book was a credit "July 22, Gille & Van Peyma, $2000," but the word "Seufert" is not written there nor is there anything in either book to indicate where this $2000 came from. Van Peyma said it was the $2000 he borrowed from plaintiff. No attempt was made to show by any account books that it did or did not go into the treasury of the Gille Hardware & Iron Company, but Van Peyma testified that it did go there.

The second note was dated April 27, 1894. It was made in the store of the Gille Hardware & Iron Company. There is no pretense that Mr. Gille was present, or that he knew that Van Peyma was contemplating borrowing money from plaintiff for any purpose. Van Peyma testified that after it was obtained he told Gille that they had gotten more money from plaintiff. Van Peyma also testified that Gille knew he had borrowed this money, but based his conclusion not on anything he said to Gille or that Gille said to him, but on the fact that Gille had had access to the books.

Mr. Gille testified that he probably knew that money had been obtained from plaintiff, but there is no evidence whatever in this entire record, directly or indirectly, that he ever knew that Van Peyma had signed the firm name of Gille & Van Peyma to the notes, or that the partnership had ever been credited with the $2000 or the $1130, or any other sum. On the contrary the evidence all indicates unerringly that if Mr. Gille knew that money had been obtained from plaintiff he thought it had been borrowed by the corporation and used by it. He knew that an account was kept by the corporation with the firm of Gille & Van Peyma, and he knew that firm was indebted, and he occasionally examined the account, but there was nothing in that account to indicate that the $2000 or the $1130 had been obtained from Seufert, for Seufert's name nowhere appeared therein, and there is not a word to indicate that Seufert's name was ever mentioned to him at any time, by Van Peyma or Seufert, in connection with a partnership indebtedness. The evidence to show that Mr. Gille knew of the existence of any note to Mr. Seufert is exceedingly meagre, but it absolutely fails to show that he knew his former partner had borrowed money in the name of that partnership from Seufert or any one else, until after the note in suit was executed.

As already stated the note of July 19, 1893,. for $2000, and the one of April 27, 1894, for $1130, were not offered in evidence. The first instrument offered in evidence was the draft of July 18, 1893, and the name of Gille & Van Peyma nowhere appears on that draft. The next was a note for $1317.23, dated April 27, 1896, payable on demand to Louis Seufert, bearing eight per cent interest and signed Gille & Van Peyma. Another offer was of a note dated June 19, 1898, for $2290.29, payable thirty days after demand to Louis Seufert or order, bearing eight per cent interest, and signed "Gill"—the balance of the signature being torn off.

Then there were offered other notes dated April 28th and June 19th, of each year down to 1900. These notes show that the principal therein mentioned was the amount of the principal and interest of the last previous note, respectively. Then there was offered a note dated July 1, 1901, for $4813.38, payable thirty days after demand to Louis Seufert or order; and then the note sued on, dated July 1, 1902, for $5150.86, payable to the order of Louis Seufert or order thirty days after demand, with eight per cent interest from date, and signed "Gille & Van Peyma, Jas. M. Gille, and Jas. Van Peyma." While no notes were offered in evidence of date prior to April 27, 1896, it is clear from the oral testimony and other evidence that the various notes of dates later than that were in renewal or a continuation of the debts for $2000 borrowed on July 19, 1893, and for $1130 borrowed on April 27, 1894, and that notes were given on these dates for these amounts signed by "Gille & Van Peyma, Jas. M. Gille and Jas. Van Peyma," but it is not clear that those notes bore eight per cent interest. In fact, there is no evidence whatever on that point, but counsel for both sides have presented the case as if all the notes in the series, from the first to the last, bore eight per cent.

It is now necessary to go back to the book accounts. The exhibits show that a book account, as said, was opened upon the books of the corporation in the name of "Gille & Van Peyma," and the first item on the debit side of that account is dated July 10, 1891. That account was continued to December 1, 1899, when it was closed, and showed a balance due by the firm of $20,007.96, and it shows that said balance was on that date transferred to James Van Peyma. The testimony shows that it was thereafter continued as the personal account of James Van Peyma, though under the words "Gille & Van Peyma" written at the tops of the pages, down to October 22, 1902, when it showed an indebtedness to the corporation of $44,500.81, and on that date

an account was opened with "Gille & Van Peyma, Trustee," and this indebtedness of $44,500.81 was on that date transferred to that account, and it so remained until the corporation went into the hands of a receiver, when it showed an indebtedness of $45,244.72 to the corporation.    These facts call for further explanation.

The corporation had a distinct stock of tin goods or department business which was known as the "Evans Manufacturing Company."    Van Peyma was desirous of acquiring all the certificates of stock of the corporation, and Gille wanted to get out.    On December 1, 1899, an arrangement was effected by which Gille agreed to sell 400 shares of his stock to Van Peyma for the Evans Manufacturing Company stock of goods, and by which he would surrender to Van Peyma the other 200 shares of stock he held (being his own remaining 100 shares, his son Henry's 50 shares and the 50 shares which had been formerly sold by him to Adams and which he seems to have re-acquired) upon condition that Van Peyma would pay all the debts of the partnership, whatever they were.    The stock was valued at $125 at that time, so that the 400 shares were estimated to be worth $50,000, and the Evans tin stock was also valued at $50,000.    The certificates of stock were assigned by Gille to A. D. Bayless, trustee, but delivered to Van Peyma, and the corporation made a bill of sale of the Evans stock of goods to Gille and he moved it across the street, and thereafter conducted a business under the name of the Gille Manufacturing Company, and from that time on he had nothing to do with the management of the corporation's business, and there is no evidence that he ever saw its books thereafter, or personally knew that Van Peyma continued to use the firm name in aid of the business of the corporation.

Van Peyma claims to have later bought for $35,000 so much of the 400 shares of stock as were assigned

to Bayless and other stock held by him and says he paid for it in this wise. He drew a check on the corporation for $25,000 payable to Bayless, and issued to him two notes for $5000 each, signed by Gille & Van Peyma, and charged the entire sum of $35,000 to that partnership. He also charged the partnership (though the books at that time showed its account with the corporation was closed and the balance it owed had been transferred to him) with the Evans stock, $50,000, and credited it with "Capital stock, 500 shares, $50,000." This, of course, was no payment at all, but Gille seems to have known absolutely nothing about it. He did not know until after the corporation had failed that Van Peyma had used the corporation's money to pay for the certificates of stock, and did not know that the old partnership had been charged with the amount paid Bayless, and did not know that Van Peyma had charged the firm with 500 shares of the capital stock as an offset to the Evans stock of goods. Van Peyma with great unction proclaims his honesty in all these matters, but his testimony convinces us that whatever money he obtained for the corporation in the name of the partnership he kept concealed from this old man, who at no time knew he had signed the firm name either to the Seufert notes or any other notes, nor could he have ascertained that he had done so by an examination of the books, because those books prior to December, 1899, revealed nothing that would have given him notice, and after that time Gille never saw the books, and really had no connection with the company.

At the time Gille bought the Evans stock (in December, 1899) he also delivered to Van Peyma the remaining 200 shares of stock held by him, for which Van Peyma agreed to pay the debts of the old partnership. Gille at that time knew from his son that the debts of the partnership were about thirty-five thousand dol-

lars, but he did not know that the Seufert notes were a part of the debts.

No notice was given of the dissolution of the partnership of Gille & Van Peyma, and it was in fact never formally dissolved. The evidence fails to show that Gille ever had any personal knowledge that money was borrowed by Van Peyma in the name of the partnership after it ceased to buy and sell goods in June, 1891; but it absolutely fails to show that Gille ever instructed Van Peyma not to borrow money or execute notes in the name of the firm, or said to plaintiff or anyone else that he had no authority to do so.

The record in this case is exceedingly long, and we have in as small a compass as possible set out the salient facts which counsel contend bear on the issues.

The petition in this case was in two counts. The first count is a suit on the note for $5150.86, dated July 1, 1902. It pleads the existence of the partnership, the execution and delivery of the note, and demands, in the ordinary form of a petition bottomed on a promissory note, payment thereof. It contains no averment in regard to the note for $2000 (if there was one) dated July 19, 1893, or the note for $1130 dated April 27, 1894, or any renewals thereof.

The second count alleges the existence of the partnership at all times mentioned, and that "on the 19th day of July, 1893, this plaintiff loaned to said partnership of Gille & Van Peyma, to said James M. Gille and James Van Peyma, at their special instance and request, the sum of two thousand dollars, which said sum said defendants promised and agreed at the time, in writing, to repay," etc. It then contains similar allegations in reference to the loan of $1130, and alleges the renewal of these notes annually, and their consolidation into one note on July 1, 1901, and the renewal of that note on July 1, 1902, for $5150.86, and asks for judgment for this sum and interest. This second count

was dismissed before trial, and hence it is not for consideration.

The separate answer of James M. Gille pleaded, first, that he and James Van Peyma "were not at any of the times named in the first count of the petition copartners doing business in or under the name of Gille & Van Peyma or any other name;" second, that James M. Gille "did not, as a member of the alleged firm of Gille & Van Peyma, or individually, on the 1st day of July, 1902, or at any other time," execute the note; and, third, he "denies each and every other allegation in said count of the petition."

The reply, in addition to being a general denial, "further says that all of the notes and instruments of writing mentioned in the petition in this cause were signed in the manner and form stated therein by the defendant James Van Peyma for and on behalf of himself and James M. Gille and the firm of Gille & Van Peyma, all of which was done with the knowledge and consent and by the authority of said James M. Gille."

At the beginning of the trial plaintiff's counsel announced in open court: "We do not rely on estoppel; we rely on the note." The matter for decision then is, can plaintiff recover on the first count of his petition?

## OPINION.

It should be stated at the very outset that there is no evidence that the note for $5150.86, dated July 1, 1902, the note sued on, was signed on behalf of James M. Gille and the firm of Gille & Van Peyma with the express "knowledge and consent" of James M. Gille, nor is there any evidence that any prior note payable to plaintiff was signed on his behalf or on behalf of said firm "with his knowledge and consent."

## I.

Was the partnership dissolved before the note in suit was executed? The question is not without difficulty. The adjudicated cases on the subject are exceedingly rare.

In June, 1891, the partnership transferred all its stock of goods to the corporation. On June 1st of that year it made an invoice showing assets amounting to $184,253.90 belonging to the partnership and these assets were turned over to the corporation, and that corporation, with a capital stock of $150,000, issued to these two partners $90,000 of that stock and on the books of the company credited the partnership with these assets, and charged it with this stock, leaving a balance at that time of $94,253.90 to the credit of the firm. Thereafter the partnership bought no goods and sold no goods. It had none to sell. It was no longer a trading firm. It was over two years after that when Van Peyma borrowed the $2000 from plaintiff for the corporation; and it was nine years thereafter that he signed the firm's name to the note sued on, and in those nine years the partnership had bought no goods and sold none; but the partnership certainly owed debts, or else it would have issued more than $90,000 of stock for $184,253.90 of assets, and it cannot be conceived that all these assets, if that were a fair invoice, would have been turned over to the corporation unless it was the expectation of the partners that as the stocks of merchandise were sold the corporation would use the money realized from the sale to pay the debts of the partnership. The corporation, therefore, was, in effect, by these partners, made the firm's agent to settle its affairs—to collect its accounts and pay its debts. Did these facts dissolve the partnership?

In Parsons on Partnership (4 Ed.), sec. 285, it is said: "It has been questioned whether the incorporation of the partners, for a similar business, would

amount to a dissolution by consent. This has not unfrequently occurred in this country, where successful manufacturers or mechanics have found their business so enlarged that it was more convenient to transact it under the form of a corporation. We should say that this fact alone would not necessarily be the dissolution of the partnership. But it never would stand alone. The corporation would always have some defined relation to the former partnership. Either it would be a substitute, taking all its business and all its property, leaving it nothing to hold, nothing to do, and nothing to be; in which case it would be clear that the partnership had died out; or else some portion of the business and the stock would be left for the firm, and some use made of it; and then it would remain for these purposes."

We think the partnership was in law dissolved when it transferred its entire stock of goods to the corporation. Thereafter, as this learned author says, the corporation became "a substitute" for the partnership, "taking all its business and all its property, leaving it nothing to hold, nothing to do, and nothing to be." "In which case," he says, "it would be clear that it had died out." Such action on the part of a partnership is very similar in its legal effects to the retirement of one member of the firm, which *ipso facto* operates as a dissolution of the firm. [Spaunhorst v. Link, 46 Mo. 197; Allen v. Logan, 96 Mo. 591; Friedman v. Punch, 93 Mo. App. 464.] Or such action may be likened to a partnership which, by the terms of association, is to continue for a definite term of years, in which case, "when that period expires, or the time for dissolution arrives, the partnership dies, of course." [Parsons on Contracts (4 Ed.), sec. 280.] This partnership was a mercantile one organized for the purposes of trade. It had no other business except to buy and sell goods. When it transferred all its goods to the corporation and ceased to either buy

Seufert v. Gille.

or sell goods and to have any place of business, the purposes of its existence had been fulfilled and it was thereby dissolved as a trading partnership, and both the partners so understood it; and "the mere fact that a firm has incurred debts and charged its assets for their payment is no proof of an agreement that the firm shall continue until its debts are paid, for those debts may be paid as well after as before a dissolution." [1 Lindley on Partnership (2 Am. Ed.), p. 121; King v. Accumulative Assurance Co., 3 C. B. N. S. 151.] And generally one partner cannot execute a note in the name of the firm after its dissolution, even in renewal of a note of the firm, so as to bind any other partner or the firm. [Evangelical Synod v. Schoeneich, 143 Mo. 652; Moore v. Lackman, 52 Mo. 323; Springer v. Cabell, 10 Mo. 640; Friedman v. Punch, 93 Mo. App. 464; Broughton v. Sumner, 80 Mo. App. 386.] In Evangelical Synod v. Schoeneich, 143 Mo. l. c. 659, this court said: "No member of a copartnership after its dissolution can by any act or admission of his bind the firm of which he was a member, except it be otherwise agreed by the articles of association or of dissolution," and a large number of cases are cited in support of that rule.

But the rule has its exceptions, and they grow out of the very nature of things. The questions of notice and implied assent arise. Parsons on Partnership (4 Ed.), sec. 299, says: "On the same principles which hold a principal bound by the acts of his general agent whose authority he had revoked, unless he has given sufficient notice of his revocation, any person who deals with one professing to act for himself and others as partners in a certain firm, and believes that he so acts, and is justified in that belief, either by what those others so held out as partners have done or have failed to do, has both a legal and a moral right to hold them as partners. . . . The chief importance of this requirement of notice, and the principal questions

arising under it, belong to cases of dissolution by change, in which the retiring partner must give notice of his retirement, or continue to be held as partner." But the author adds in section 323: "The principle, that, after a partnership is dissolved, one partner dealing with a person having no notice of the dissolution may bind his late copartner, applies only to transactions in the usual course of the firm's business." And this is unquestionably the law. If the making of the note to Seufert was not a transaction "in the usual course of the firm's business" no notice to Seufert that the partnership was no longer a going concern was required. But in the transaction of the business of a mercantile or trading partnership it is well understood that negotiable obligations, such as promissory notes, are customarily executed and issued, and hence each partner is vested with power to sign the partnership name thereto. [Winship v. Bank, 5 Pet. (U. S.) l. c. 561.] But the authorities are not agreed as to the power of one partner to make notes in the name of the firm after its dissolution. In some cases it has been held that such power applies only to times preceding dissolution. In Long v. Story, 10 Mo. 636, a case in many respects similar to this, it is said: "The principle is well established, that, after the dissolution of a partnership, one partner cannot bind the other by drawing a note in the partnership name, unless he has a particular power vested in him for that purpose. A general authority to settle the partnership concerns does not create such a power." In that case the partnership had borrowed money from Story, and after its dissolution one of the partners in the name of the firm executed the note sued on, and there was also testimony that the other partner had stated to the payee's agent before the note was signed, that the signing partner "had authority to sign for both, and if he signed it would be all right." It was also held in

that case, in effect, that if the dissolution of the firm was known to the payee of the note when it was given, although it was given in renewal of a note given for money borrowed while the partnership was a going concern, the plaintiff could not recover, unless the defendant partner had expressly authorized the renewal. We think this last holding was the law. In Knaus v. Givens, 110 Mo. 58, it was expressly held by this court that notes executed in the firm name, after its dissolution, by one partner, for his own use, were binding on the other partners, unless the payee had notice of the dissolution at the time he received them; and to the same effect were Moore v. Lackman, 52 Mo. 323, and Holt v. Simmons, 16 Mo. App. 97, cited in the Knaus case. See also Pope v. Risley, 23 Mo. l. c. 187. Some of the authorities hold that this rule only applies when the payee of the note had dealt with the partnership prior to its dissolution; but if we were to so confine the rule in this case, we would still be compelled to hold that plaintiff was entitled to recover, if he was wholly without knowledge of the dissolution, because there was some testimony that he had dealt with the partnership prior to its dissolution in 1891. The evidence in this case unquestionably establishes that Seufert did know before any money was borrowed from him that the hardware business was being done in the name of the Gille Hardware & Iron Company, but it is conflicting as to whether or not he knew that company was a corporation. There is much evidence from which it might have been found that he did know, but he also testified that he supposed that Gille and Van Peyma were still owners of the business and conducting it as partners. The settlement of that fact was, therefore, for the jury, under proper instructions. The rule is that the renewal of a note by one partner of the firm, after dissolution, without notice of dissolution, is binding on the other party who had no knowledge of its renewal. But there is no need of published

notice brought home to plaintiff, if he had actual knowledge of the dissolution; and there were abundant facts in this case from which the jury would have been authorized to conclude that plaintiff did know that the old partnership had long been dissolved when he accepted, without Gille's knowledge, the note sued on dated July 1, 1902.

The evidence shows conclusively, without any material contradiction, that two years and a half before this note was made Gille withdrew from the corporation and went across the street and set up a separate business, and thereafter had no connection with the corporation, and that plaintiff was often at the corporation's store and knew that Gille was in a separate business. Aside from this, there are many facts to indicate that he had actual knowledge that the partnership had gone out of business and as to all practical purposes had been dissolved. If he had such knowledge, he cannot recover, whether or not there was any formal dissolution and whether or not any published notice of dissolution was brought home to him.

Plaintiff's instructions entirely omitted the question of notice. They did not place his right to recover on his lack of knowledge that the corporation had been dissolved. They were, therefore, erroneous and the judgment must be reversed.

But there is another ground upon which the law might authorize a recovery by plaintiff on this note. Even though plaintiff knew of the dissolution of the firm, Gille is bound on his renewal note if it was renewed in the name of the firm with his express assent or his implied sanction. [See cases supra.] There is no evidence of any express assent. On the contrary, there is no evidence whatever that Mr. Gille ever knew that Van Peyma had in the firm name executed this note, nor is there any evidence that after December, 1899, when he withdrew from the corporation and established a separate business of his own, or even after

June, 1891, when the corporation took over all the goods of the partnership, he by word or writing authorized Van Peyma to sign the firm's name to any note. So there can be no issue of express assent. But there are some facts from which his assent and sanction might have been implied, and so that issue should have been submitted to the jury. It was submitted, but in a series of instructions which are mere propositions of law. The first instruction tells the jury that "if they find and believe from the evidence that defendant James Van Peyma had authority from James M. Gille to sign the firm name of Gille & Van Peyma to the note dated July 1, 1902, then your verdict will be for the plaintiff." That instruction was correct in confining the issue to Van Peyma's authority to sign the one note of July 1, 1902, but it should have told the jury what facts would constitute such authority. It should not have left the jury, as it did, to determine a pure legal question. All of plaintiff's instructions have the same infirmity, as we shall notice further on.

## II.

John Hoagland had been indebted to the partnership of Gille & Van Peyma. On December 31, 1891, finding himself unable to pay, he executed a note to J. M. Gille and James Van Peyma for $485, and secured it by a mortgage on some lots in Kansas City. In October, 1897, Van Peyma borrowed $3000 from Charles Eibes and gave a note signed by Gille & Van Peyma in payment, and afterwards paid $2000 and the interest thereon. Charles Eibes died in January, 1902, and this note was, in the distribution of his estate, given to his daughter Emma. After the corporation failed she threatened to sue Gille on this note and by way of settlement Gille assigned to her the Hoagland note, which in some way had come into his possession.

That note was introduced in evidence to show Gille had knowledge of Van Peyma's course of conduct in signing the firm name to notes. Gille's counsel moved that all the evidence pertaining to it be stricken out, because it clearly showed that Gille had settled with Emma by way of a compromise, but the court overruled the objection and that ruling is assigned as error. There is no evidence that Gille ever knew of the existence of the Eibes note until after the corporation had failed, and when Emma demanded payment he expressed a desire that it might be paid, and a settlement satisfactory to Emma was made by a transfer of the Hoagland note and mortgage. We think this evidence was competent as bearing on the question of Gille's implied assent to Van Peyma's execution in the firm's name of the note dated July 1, 1902. The Eibes note may have been settled by way of compromise, but it was not in compromise of this suit, and the very fact he did settle it tended to show that he recognized Van Peyma's authority to sign notes in the name of the firm. If Gille had offered this note and mortgage to plaintiff by way of compromise of his claim, we would be confronted with the application of the law as it pertains to attempts to compromise suits as evidence. But plaintiff had no part in it, and the question in the end is, did the fact that Gille, after the note in suit was made, settled a partnership note executed by Van Peyma in the firm name in 1897, at what he supposed was something less than its face value, tend to establish a recognition on his part of Van Peyma's authority to sign the partnership name to notes? We think it did. [Ashlock v. Linder, 50 Ill. 169; Ferry v. Taylor, 33 Mo. l. c. 334; Grubbs v. Nye, 21 Miss. 443.] It was not very valuable for that purpose, because the note was executed in 1897, and by July 1, 1902, the situation had changed by Gille withdrawing from all connection with the corporation and establishing a sep-

arate business of his own; but it was admissible for what it was worth.

## III.

The corporation, Gille Hardware & Iron Company, during the course of its business, borrowed money from the Bank of Commerce of Kansas City, and eight notes, the first bearing date of July 31, 1901, and the last dated May 28, 1902, in nearly every case for $5000 each, signed by the ''Gille Hardware & Iron Co.,'' and indorsed on the back ''Gille & Van Peyma,'' were admitted in evidence on behalf of plaintiff, on the theory that they tended to establish, by proof of the usual course of business, the existence of the partnership on July 1, 1902, and a recognition by Gille of Van Peyma's authority to sign notes in the name of the partnership; and the admission of these notes in evidence and the testimony of the president of the bank relating to them, is assigned as error.

The evidence reveals that the bank required these notes to be indorsed by Gille & Van Peyma. There is no evidence that Gille knew they were being so indorsed, nor that the partnership ever derived any benefit whatever from this indorsement. The money derived therefrom was used by the corporation, and the partnership was not charged with them in any book account kept by the corporation or the partnership. It will be observed that all these notes introduced in evidence were made after Gille had retired from the corporation, but there is some evidence that some notes were given by the corporation to the Union Avenue Bank of Commerce, a branch bank of the Bank of Commerce, before those in evidence were made and that they were indorsed by the partnership by Van Peyma, but none of those notes were offered in evidence nor were their dates or amounts given. It was error to admit these notes in evidence. Even if the partnership was in existence when they were made Van Peyma had no au-

thority to use the firm's name as a surety for the corporation. One partner "has no implied authority to bind the firm by contracts of guaranty or suretyship either for himself individually or for strangers to the firm." [Mechem's Elements of Partnership, sec. 188.] "It is settled law that the party who takes a promissory note bearing the indorsement of a firm, either as guarantors or sureties, takes it burdened with the presumption that the firm name was not signed in the usual course of partnership business, and no recovery can be had by simply showing the indorsement. The holder is required to show special authority to make the indorsement on the part of the partner by whom the firm name was signed, or an authority to be implied from the common course of business of the firm, or previous course of dealing between parties, or that the indorsement was subsequently adopted and acted upon by the firm." [Clarke v. Wallace, 1 N. D. l. c. 407.] "Where one of two partners subscribes the copartnership name to a note as sureties for a third person, without the authority or consent of the other partner, the latter is not bound, and it lies upon the plaintiff to prove the consent or authority of the other partner." [Andrews v. Planters Bank, 15 Miss. l. c. 195; Bank v. McDonald, 127 Mass. 82.] It is well settled that the power of a partner, implied from the contract of partnership, to act as agent for his copartners, and to bind them by contracts in the firm name, is limited to transactions within the scope of the partnership business. It is clear, therefore, that in the absence of special authority this power does not extend to contracts of guaranty or suretyship, or to the indorsement of negotiable paper for the accommodation of a stranger to the firm, for it will not, ordinarily, be intended that such contracts are necessary for the conduct of the partnership business." [Laverty v. Burr, 1 Wend. 529; Bank of Tennessee v. Saffarrans, 3 Humph. 597; Lang v. Waring, 17 Ala. 145; Sutton v. Irwine, 12 Serg. &

Raw. 13; Rollins v. Stevens, 31 Me. 454; N. Y. Fire-
men Ins. Co. v. Bennett, 5 Conn. 574; Stall v. Catskill
Bank, 18 Wend. 466; Shoe Co. v. Long-Bell Lumber
Co., 86 Mo. App. 438.]

There was no attempt to show any special author-
ization by Gille to Van Peyma to indorse these notes
or any other notes in the firm's name; nor could the
authority be implied from the common course of busi-
ness of the firm, for there is no evidence that Gille
even knew that Van Peyma was indorsing the firm's
name to notes to any one as surety for the corporation,
or that the indorsement of these notes was subse-
quently adopted and acted upon by him. Nor was any
such previous course of dealing between the firm and
the bank and these two partners shown. In support
of that theory plaintiff undertook to show by Van
Peyma that in 1893, when the panic was on, the bank
"requested us, Gille & Van Peyma, to indorse the
Gille Hardware & Iron Company paper in the bank,"
and that Gille had never directed Van Peyma "to cease
signing' notes and paper in that connection in that
way." If Gille gave authority to sign his name as
indorser of the corporation's notes, that was in 1893,
during the time of great financial distress, and in 1899
he withdrew from the corporation, went across the
street and set up and conducted a separate business,
and thereafter had no connection with the corporation,
except that one share of stock was issued to him by Van
Peyma in order that the corporation might have the
number of directors required by the statute and he
might be the nominal (though not the actual) treasurer,
and the first of these notes offered in evidence bore a
date eighteen months subsequent to that time. We find
nothing in these facts to establish any such a previous
course of dealing between the firm, Gille, Van Peyma
and the bank, as authorized the bank to infer that the
authority given in 1893 had been continued down to
1901. Authority to indorse notes for the corporation

in 1893, when the whole country was in the midst of a financial panic, was no authority to indorse other notes as surety for the corporation eight and nine years later.

It was error to admit these notes in evidence for any purpose. They did not tend to show that Van Peyma had authority to sign the firm's name as maker to the note plaintiff sues on; and if they were offered to show that Van Peyma had authority to borrow money for the firm from plaintiff in 1893, they were wholly irrelevant, for first, the suit was not for borrowed money, but on the note made on July 1, 1902; and, second, authority to borrow money for a firm or to make a note for the debts of a firm is a very different thing from authority to guarantee the payment of another's note.

## IV.

Appellant contends that the trial court erred in permitting plaintiff to prove that Van Peyma on July 19, 1893, borrowed $2000 in the name of the firm, and $1130 on April 27, 1894. The notes given at those times were not offered in evidence, but notes given in 1897 for those amounts, with interest, were admitted in evidence, and annual renewals thereof down to 1901, when the two dated in 1900 were consolidated into one note for $4813.88 and this note was renewed by the note sued on for $5150.86 on July 1, 1902. Appellant contends that by this method plaintiff was permitted to prove the consideration of the note sued on. No consideration was pleaded nor was it necessary to prove or plead the consideration. The suit, as it was tried upon the first count of the petition, was a plain suit on a note. The only plea to that count was *non est factum*—that is, that, first, there was no partnership in existence when Van Peyma signed the firm's name to the note, and, second, that Gille did not execute the note. To that plea plaintiff replied that "all

the notes" were signed with Gille's "knowledge and consent," and "for and on behalf of Gille and of the firm." Appellant contends that the trial court permitted plaintiff to prove that "the consideration of the note sued on was the money borrowed in 1893 and 1894;" that "to allow the authority to execute the note sued on to be proven by proof of the original consideration for the note sued on, is to allow plaintiff to sue upon one cause of action and sustain it by proof of another, and to violate the established rule that a party cannot sue upon one cause of action and prove another or recover upon another cause of action;" and that "this testimony produced the verdict of the jury on the idea that Gille & Van Peyma got $2000 July 19, 1893, and $1130 April 27, 1894, the jury ignoring the only real issue in the case, to-wit, Van Peyma's authority to sign Gille's name to the note sued on."

The decision of the point is not without embarrassment. Much of the testimony went to establish the certainty of the loans made in 1893 and 1894, and yet this was not a suit for borrowed money. The suit was on a note executed on July 1, 1902, and that alone, and one of the questions to be decided was whether Gille, by his course of conduct, had clothed Van Peyma with apparent authority to sign the note of that date, and we are of the opinion that this evidence was competent as tending to prove that issue. It was not competent to establish the consideration of the note; but, when connected with the fact that Gille testified that he knew Van Peyma had borrowed money of plaintiff, and that he had agreed with Van Peyma in 1899 that Van Peyma would pay the partnership debts, and with Van Peyma's testimony that he told Gille in 1893 that money had been borrowed from Seufert and that Gille once said to him that he would like to see Seufert paid, it was competent as tending to establish Gille's implied assent to Van Peyma's attempt to bind the

firm on the note sued on. [Pope v. Risley, 23 Mo. l. c. 187.]

But the second instruction given for plaintiff told the jury that "if you find and believe from the evidence that said partnership borrowed money after 1891 on the signature of Gille & Van Peyma, made by Van Peyma upon the authority or with the acquiescence of Gille, and that said Van Peyma signed the firm name to the note sued on, dated July 1, 1902, with the authority of Gille, then your verdict will be for plaintiff." The first part of the instruction was error. The suit was not for borrowed money, and the issue was not whether Van Peyma had authority after 1891 to borrow money in the firm's name; but the issue was whether he had authority to execute the note of July 1, 1902, and the instructions should have confined the issue to that question. The testimony was competent as bearing on that issue, but if any references were made to it in the instructions at all, they should have told the jury that it was competent only as it tended to establish Van Peyma's authority in 1902 to execute the note sued on. There are cases that hold that where authority to execute notes by one partner in the firm's name is once shown to exist, it will be presumed to continue until withdrawn. But we have found none that hold that where it has not been shown to exist after the firm was dissolved it will be presumed to continue, or that it will continue for eight years, or that it will be presumed to continue, even if shown to have once existed, where there has been a radical change in the situation as there was in the relationship of the partners by the withdrawal of Gille from the corporation in 1899, which plaintiff knew.

## VI.

The court gave these two instructions, numbered 3 and 4, for plaintiff:

"3. The authority, if any, of the defendant Van Peyma to sign the name of Gille & Van Peyma to the note sued on, need not have been expressly or directly conferred upon him by the defendant Gille, but may have been conferred by a course of business and dealing between the defendants, and neither is it necessary for plaintiff to prove by direct evidence that the defendant Van Peyma had such direct authority, but the same may be proven and established by circumstances, and the course of dealing and business between the defendants, and if from all the facts, circumstances, course of business and dealing between the defendants, detailed or shown by the evidence, you believe that the defendant Van Peyma was so authorized to so execute said note, then your verdict must be for the plaintiff and against both defendants, and it is your duty to take into consideration all of such facts, circumstances, course of business and dealing in determining such authority.

"4. The court instructs the jury that if you find from the evidence that prior to the formation of the Gille Hardware and Iron Company, a corporation, that the defendants, James M. Gille and James Van Peyma, were partners engaged in the business of buying and selling hardware, and that upon the formation of such corporation, the stock of goods theretofore owned by the partnership was sold or transferred to the corporation, that such fact alone did not effect a dissolution of said partnership, and is not sufficient to establish that the same was dissolved."

The court also gave these instructions, numbered 4, 14 and 18, on behalf of defendant.

"4. The court instructs the jury that it is only while the firm of Gille and Van Peyma engaged in trade—buying and selling goods in the ordinary way of merchants—that Van Peyma had the right to sign the name of Gille & Van Peyma or the name of James M. Gille to promissory notes for debts of the firm, with-

out authority from James M. Gille. When the firm disposed of the entire stock of goods and quit buying and selling goods in the ordinary way, then, and thereafter neither partner had a right, without authority from the other partner, to make or sign notes in the name of the firm or of each other, in favor of one who knows the firm itself is no longer engaged in buying and selling goods in the ordinary way of merchants.

"14. The jury are further instructed that Gille and Van Peyma and each of them had the right to collect and pay debts of the firm of Gille & Van Peyma after the partnership ceased to buy and sell goods, and the jury are also instructed that the mere collection and payment of partnership debts by Van Peyma or by Gille and Van Peyma, gave Van Peyma no right or authority to write Gille's name on the note sued on or any other notes given by Van Peyma after the firm of Gille & Van Peyma quit buying and selling goods.

"18. If the jury believe and find that Gille & Van Peyma sold their entire stock of goods to the Gille Hardware and Iron Company and ceased buying and selling goods as the firm of Gille & Van Peyma on or about June 1, 1891, and received for their stock of goods shares of stock in the Gille Hardware and Iron Company, a corporation, and then divided such shares among themselves, and it was then understood by and between Gille & Van Peyma, with or without words to that effect, that the firm of Gille & Van Peyma was dissolved, then the jury are instructed that these acts constituted a dissolution of the firm, though there remained debts due the firm of Gille & Van Peyma to be paid, and no notice to the plaintiff of such dissolution was necessary if made at that time."

These instructions are contradictory. It is impossible to understand how the jury could have found for plaintiff, if they had obeyed defendant's instructions numbered 4 and 18. If plaintiff's instructions cor-

rectly declared the law, then plainly defendant's did
not. All of these instructions are faulty. Plaintiff's
third and fourth instructions undertook to tell the jury
that Gille's sanction of Van Peyma's execution of the
note on July 1, 1902, might be implied from "all the
facts, circumstances, course of business and dealing be-
tween the defendants detailed in evidence." They
should have told the jury what facts in evidence would
establish Gille's implied assent. As they stand they al-
most amount to a direction to the jury to find for plain-
tiff if under all the facts they consider he ought to re-
cover.

We have already held that the transfer of all the
stock of merchandise by the partnership to the corpor-
ation, and the ceasing by the partnership thereafter to
buy and sell goods, dissolved the partnership; there-
fore, plaintiff's fourth instruction does not declare the
law.

Defendant's fourth instruction correctly declares
the law, but for clearness the words "express or im-
plied" should have been added after the clause "with-
out authority from the other partner." It includes the
question of plaintiff's knowledge of the things that
would work a dissolution of the firm. But defendant's
18th instruction is erroneous because it says no notice
of dissolution was necessary. The question of plain-
tiff's knowledge is one of the real issues in this case.
If plaintiff knew that the firm had been dissolved when
the note was given, he is not entitled to recover; other-
wise he is. We find no fault with defendant's instruc-
tion numbered 14. It is supported by numerous cases.

An exceedingly grave fault in plaintiff's instruc-
tions numbered three and four, set out above, as of
other instructions given for him, is, as already stated,
that they submit a question of law to the jury for de-
cision. Again and again they said, if Van Peyma
signed the note "with the authority of Gille," etc.; they

should state what facts would constitute such authority, at least the principal facts.   [Pratt v. Page, 32 Vt. 15.]

## VI.

There are numerous other errors assigned in appellant's brief; but we have not considered it necessary to consider them, since what we have said will guide the trial court in a proper disposition of them, if raised again.

Entertaining the views as herein indicated the judgment of the trial court should be reversed and the cause remanded.   It is so ordered.

All concur.